# NATIONAL LABOR RELATIONS BOARD *v.* J. WEINGARTEN, INC.

No. 73–1363.   Argued November 18, 1974—
Decided February 19, 1975

*Patrick Hardin* argued the cause for petitioner. With him on the brief were *Solicitor General Bork, Peter G. Nash, John S. Irving, Norton J. Come,* and *Linda Sher.*

*Neil Martin* argued the cause and filed a brief for respondent.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The National Labor Relations Board held in this case that respondent employer's denial of an employee's request that her union representative be present at an investigatory interview which the employee reasonably believed might result in disciplinary action constituted an unfair labor practice in violation of § 8 (a)(1) of the National Labor Relations Act,[1] as amended, 61 Stat. 140, because it interfered with, restrained, and coerced the individual right of the employee, protected by § 7 of the Act, "to engage in . . . concerted activities for . . . mutual aid or protection . . . ."[2] 202 N. L. R. B. 446 (1973).

---

*Jerry Kronenberg* and *Milton Smith* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging affirmance.

[1] Section 8 (a)(1), 29 U. S. C. § 158 (a)(1), provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."

[2] Section 7, 29 U. S. C. § 157, provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be

The Court of Appeals for the Fifth Circuit held that this was an impermissible construction of § 7 and refused to enforce the Board's order that directed respondent to cease and desist from requiring any employee to take part in an investigatory interview without union representation if the employee requests representation and reasonably fears disciplinary action. 485 F. 2d 1135 (1973).[3] We granted certiorari and set the case for oral argument with No. 73–765, *Garment Workers* v. *Quality Mfg. Co., post,* p. 276. 416 U. S. 969 (1974). We reverse.

affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158 (a)(3) of this title."

[3] Accord: *NLRB* v. *Quality Mfg. Co.,* 481 F. 2d 1018 (CA4 1973), rev'd, *Garment Workers* v. *Quality Mfg. Co., post,* p. 276; *Mobil Oil Corp.* v. *NLRB,* 482 F. 2d 842 (CA7 1973). The issue is a recurring one. In addition to this case and *Garment Workers* v. *Quality Mfg. Co., post,* p. 276, see *Western Electric Co.,* 205 N. L. R. B. 46 (1973); *New York Telephone Co.,* 203 N. L. R. B. 180 (1973); *National Can Corp.,* 200 N. L. R. B. 1116 (1972); *Western Electric Co.,* 198 N. L. R. B. 82 (1972); *Mobil Oil Corp.,* 196 N. L. R. B. 1052 (1972), enforcement denied, 482 F. 2d 842 (CA7 1973); *Lafayette Radio Electronics,* 194 N. L. R. B. 491 (1971); *Illinois Bell Telephone Co.,* 192 N. L. R. B. 834 (1971); *United Aircraft Corp.,* 179 N. L. R. B. 935 (1969), aff'd on another ground, 440 F. 2d 85 (CA2 1971); *Texaco, Inc., Los Angeles Terminal,* 179 N. L. R. B. 976 (1969); *Wald Mfg. Co.,* 176 N. L. R. B. 839 (1969), aff'd on other grounds, 426 F. 2d 1328 (CA6 1970); *Dayton Typographic Service, Inc.,* 176 N. L. R. B. 357 (1969); *Jacobe-Pearson Ford, Inc.,* 172 N. L. R. B. 594 (1968); *Chevron Oil Co.,* 168 N. L. R. B. 574 (1967); *Texaco, Inc., Houston Producing Division,* 168 N. L. R. B. 361 (1967), enforcement denied, 408 F. 2d 142 (CA5 1969); *Electric Motors & Specialties, Inc.,* 149 N. L. R. B. 1432 (1964); *Dobbs Houses, Inc.,* 145 N. L. R. B. 1565 (1964); *Ross Gear & Tool Co.,* 63 N. L. R. B. 1012 (1945), enforcement denied, 158 F. 2d 607 (CA7 1947). See generally Brodie, Union Representation and the Disciplinary Interview, 15 B. C. Ind. & Com. L. Rev. 1 (1973); Comment, Union Presence in Disciplinary Meetings, 41 U. Chi. L. Rev. 329 (1974).

I

Respondent operates a chain of some 100 retail stores with lunch counters at some, and so-called lobby food operations at others, dispensing food to take out or eat on the premises. Respondent's sales personnel are represented for collective-bargaining purposes by Retail Clerks Union, Local 455. Leura Collins, one of the sales personnel, worked at the lunch counter at Store No. 2 from 1961 to 1970 when she was transferred to the lobby operation at Store No. 98. Respondent maintains a companywide security department staffed by "Loss Prevention Specialists" who work undercover in all stores to guard against loss from shoplifting and employee dishonesty. In June 1972, "Specialist" Hardy, without the knowledge of the store manager, spent two days observing the lobby operation at Store No. 98 investigating a report that Collins was taking money from a cash register. When Hardy's surveillance of Collins at work turned up no evidence to support the report, Hardy disclosed his presence to the store manager and reported that he could find nothing wrong. The store manager then told him that a fellow lobby employee of Collins had just reported that Collins had purchased a box of chicken that sold for $2.98, but had placed only $1 in the cash register. Collins was summoned to an interview with Specialist Hardy and the store manager, and Hardy questioned her. The Board found that several times during the questioning she asked the store manager to call the union shop steward or some other union representative to the interview, and that her requests were denied. Collins admitted that she had purchased some chicken, a loaf of bread, and some cake which she said she paid for and donated to her church for a church dinner. She explained that she purchased four pieces of chicken for which the price was $1, but that because the lobby department

was out of the small-size boxes in which such purchases were usually packaged she put the chicken into the larger box normally used for packaging larger quantities. Specialist Hardy left the interview to check Collins' explanation with the fellow employee who had reported Collins. This employee confirmed that the lobby department had run out of small boxes and also said that she did not know how many pieces of chicken Collins had put in the larger box. Specialist Hardy returned to the interview, told Collins that her explanation had checked out, that he was sorry if he had inconvenienced her, and that the matter was closed.

Collins thereupon burst into tears and blurted out that the only thing she had ever gotten from the store without paying for it was her free lunch. This revelation surprised the store manager and Hardy because, although free lunches had been provided at Store No. 2 when Collins worked at the lunch counter there, company policy was not to provide free lunches at stores operating lobby departments. In consequence, the store manager and Specialist Hardy closely interrogated Collins about violations of the policy in the lobby department at Store No. 98. Collins again asked that a shop steward be called to the interview, but the store manager denied her request. Based on her answers to his questions, Specialist Hardy prepared a written statement which included a computation that Collins owed the store approximately $160 for lunches. Collins refused to sign the statement. The Board found that Collins, as well as most, if not all, employees in the lobby department of Store No. 98, including the manager of that department, took lunch from the lobby without paying for it, apparently because no contrary policy was ever made known to them. Indeed, when company headquarters advised Specialist Hardy by telephone during the interview that

headquarters itself was uncertain whether the policy against providing free lunches at lobby departments was in effect at Store No. 98, he terminated his interrogation of Collins. The store manager asked Collins not to discuss the matter with anyone because he considered it a private matter between her and the company, of no concern to others. Collins, however, reported the details of the interview fully to her shop steward and other union representatives, and this unfair labor practice proceeding resulted.[4]

## II

The Board's construction that § 7 creates a statutory right in an employee to refuse to submit without union representation to an interview which he reasonably fears may result in his discipline was announced in its decision and order of January 28, 1972, in *Quality Mfg. Co.,* 195 N. L. R. B. 197, considered in *Garment Workers* v. *Quality Mfg. Co., post,* p. 276. In its opinions in that case and in *Mobil Oil Corp.,* 196 N. L. R. B. 1052, decided May 12, 1972, three months later, the Board shaped the contours and limits of the statutory right.

*First,* the right inheres in § 7's guarantee of the right of employees to act in concert for mutual aid and protection. In *Mobil Oil,* the Board stated:

"An employee's right to union representation upon request is based on Section 7 of the Act which guarantees the right of employees to act in concert for

---

[4] The charges also alleged that respondent had violated § 8 (a) (5) by unilaterally changing a condition of employment when, the day after the interview, respondent ordered discontinuance of the free lunch practice. Because respondent's action was an arbitrable grievance under the collective-bargaining agreement, the Board, pursuant to the deferral-to-arbitration policy adopted in *Collyer Insulated Wire,* 192 N. L. R. B. 837 (1971), "dismissed" the § 8 (a) (5) allegation. No issue involving that action is before us.

'mutual aid and protection.' The denial of this right has a reasonable tendency to interfere with, restrain, and coerce employees in violation of Section 8 (a)(1) of the Act. Thus, it is a serious violation of the employee's individual right to engage in concerted activity by seeking the assistance of his statutory representative if the employer denies the employee's request and compels the employee to appear unassisted at an interview which may put his job security in jeopardy. Such a dilution of the employee's right to act collectively to protect his job interests is, in our view, unwarranted interference with his right to insist on concerted protection, rather than individual self-protection, against possible adverse employer action." *Ibid.*

*Second,* the right arises only in situations where the employee requests representation. In other words, the employee may forgo his guaranteed right and, if he prefers, participate in an interview unaccompanied by his union representative.

*Third,* the employee's right to request representation as a condition of participation in an interview is limited to situations where the employee reasonably believes the investigation will result in disciplinary action.[5] Thus the Board stated in *Quality:*

"We would not apply the rule to such run-of-the-

---

[5] The Board stated in *Quality:* " 'Reasonable ground' will of course be measured, as here, by objective standards under all the circumstances of the case." 195 N. L. R. B. 197, 198 n. 3. In *NLRB* v. *Gissel Packing Co.,* 395 U. S. 575, 608 (1969), the Court announced that it would "reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry," and we reaffirm that view today as applicable also in the context of this case. Reasonableness, as a standard, is prescribed in several places in the Act itself. For example, an employer is not relieved of responsibility for discrimination against an employee

mill shop-floor conversations as, for example, the giving of instructions or training or needed corrections of work techniques. In such cases there cannot normally be any reasonable basis for an employee to fear that any adverse impact may result from the interview, and thus we would then see no reasonable basis for him to seek the assistance of his representative." 195 N. L. R. B., at 199.

*Fourth,* exercise of the right may not interfere with legitimate employer prerogatives. The employer has no obligation to justify his refusal to allow union representation, and despite refusal, the employer is free to carry on his inquiry without interviewing the employee, and thus leave to the employee the choice between having an interview unaccompanied by his representative, or having no interview and forgoing any benefits that might be derived from one. As stated in *Mobil Oil:*

"The employer may, if it wishes, advise the employee that it will not proceed with the interview unless the employee is willing to enter the interview

---

"if he has reasonable grounds for believing" that certain facts exist, §§ 8 (a)(3)(A), (B), 29 U. S. C. §§ 158 (a)(3)(A), (B); also, preliminary injunctive relief against certain conduct must be sought if "the officer or regional attorney to whom the matter may be referred has reasonable cause to believe" such charge is true, § 10 (*l*), 29 U. S. C. § 160 (*l*). See also *Congoleum Industries, Inc.*, 197 N. L. R. B. 534 (1972); *Cumberland Shoe Corp.*, 144 N. L. R. B. 1268 (1963), enforced, 351 F. 2d 917 (CA6 1965).

The key objective fact in this case is that the only exception to the requirement in the collective-bargaining agreement that the employer give a warning notice prior to discharge is "if the cause of such discharge is dishonesty." Accordingly, had respondent been satisfied, based on its investigatory interview, that Collins was guilty of dishonesty, Collins could have been discharged without further notice. That she might reasonably believe that the interview might result in disciplinary action is thus clear.

unaccompanied by his representative. The employee may then refrain from participating in the interview, thereby protecting his right to representation, but at the same time relinquishing any benefit which might be derived from the interview. The employer would then be free to act on the basis of information obtained from other sources." 196 N. L. R. B., at 1052.

The Board explained in *Quality*:

"This seems to us to be the only course consistent with all of the provisions of our Act. It permits the employer to reject a collective course in situations such as investigative interviews where a collective course is not required but protects the employee's right to protection by his chosen agents. Participation in the interview is then voluntary, and, if the employee has reasonable ground to fear that the interview will adversely affect his continued employment, or even his working conditions, he may choose to forego it unless he is afforded the safeguard of his representative's presence. He would then also forego whatever benefit might come from the interview. And, in that event, the employer would, of course, be free to act on the basis of whatever information he had and without such additional facts as might have been gleaned through the interview." 195 N. L. R. B., at 198–199.

*Fifth,* the employer has no duty to bargain with any union representative who may be permitted to attend the investigatory interview. The Board said in *Mobil,* "we are not giving the Union any particular rights with respect to predisciplinary discussions which it otherwise was not able to secure during collective-bargaining negotiations." 196 N. L. R. B., at 1052 n. 3. The Board thus adhered to its decisions distinguishing between discipli-

nary and investigatory interviews, imposing a mandatory affirmative obligation to meet with the union representative only in the case of the disciplinary interview. *Texaco, Inc., Houston Producing Division,* 168 N. L. R. B. 361 (1967); *Chevron Oil Co.,* 168 N. L. R. B. 574 (1967); *Jacobe-Pearson Ford, Inc.,* 172 N. L. R. B. 594 (1968). The employer has no duty to bargain with the union representative at an investigatory interview. "The representative is present to assist the employee, and may attempt to clarify the facts or suggest other employees who may have knowledge of them. The employer, however, is free to insist that he is only interested, at that time, in hearing the employee's own account of the matter under investigation." Brief for Petitioner 22.

## III

The Board's holding is a permissible construction of "concerted activities for . . . mutual aid or protection" by the agency charged by Congress with enforcement of the Act, and should have been sustained.

The action of an employee in seeking to have the assistance of his union representative at a confrontation with his employer clearly falls within the literal wording of § 7 that "[e]mployees shall have the right . . . to engage in . . . concerted activities for the purpose of . . . mutual aid or protection." *Mobil Oil Corp.* v. *NLRB,* 482 F. 2d 842, 847 (CA7 1973). This is true even though the employee alone may have an immediate stake in the outcome; he seeks "aid or protection" against a perceived threat to his employment security. The union representative whose participation he seeks is, however, safeguarding not only the particular employee's interest, but also the interests of the entire bargaining unit by exercising vigilance to make certain that the employer does not initiate or continue a practice of imposing pun-

ishment unjustly.[6]   The representative's presence is an assurance to other employees in the bargaining unit that they, too, can obtain his aid and protection if called upon to attend a like interview.   Concerted activity for mutual aid or protection is therefore as present here as it was held to be in *NLRB* v. *Peter Cailler Kohler Swiss Chocolates Co.*, 130 F. 2d 503, 505–506 (CA2 1942), cited with approval by this Court in *Houston Contractors Assn.* v. *NLRB*, 386 U. S. 664, 668–669 (1967):

> " 'When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a "concerted activity" for "mutual aid or protection," although the aggrieved workman is the only one of them who has any immediate stake in the outcome.   The rest know that by their action each of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is "mutual aid" in the most literal sense, as nobody doubts.' "

The Board's construction plainly effectuates the most fundamental purposes of the Act.   In § 1, 29 U. S. C. § 151, the Act declares that it is a goal of national labor policy to protect "the exercise by workers of full freedom

---

[6] "The quantum of proof that the employer considers sufficient to support disciplinary action is of concern to the entire bargaining unit.  A slow accretion of custom and practice may come to control the handling of disciplinary disputes.  If, for example, the employer adopts a practice of considering [a] foreman's unsubstantiated statements sufficient to support disciplinary action, employee protection against unwarranted punishment is affected.  The presence of a union steward allows protection of this interest by the bargaining representative."  Comment, Union Presence in Disciplinary Meetings, 41 U. Chi. L. Rev. 329, 338 (1974).

of association, self-organization, and designation of representatives of their own choosing, for the purpose of . . . mutual aid or protection." To that end the Act is designed to eliminate the "inequality of bargaining power between employees . . . and employers." *Ibid.* Requiring a lone employee to attend an investigatory interview which he reasonably believes may result in the imposition of discipline perpetuates the inequality the Act was designed to eliminate, and bars recourse to the safeguards the Act provided "to redress the perceived imbalance of economic power between labor and management." *American Ship Building Co.* v. *NLRB,* 380 U. S. 300, 316 (1965). Viewed in this light, the Board's recognition that § 7 guarantees an employee's right to the presence of a union representative at an investigatory interview in which the risk of discipline reasonably inheres is within the protective ambit of the section " 'read in the light of the mischief to be corrected and the end to be attained.' " *NLRB* v. *Hearst Publications, Inc.,* 322 U. S. 111, 124 (1944).

The Board's construction also gives recognition to the right when it is most useful to both employee and employer.[7] A single employee confronted by an employer

---

[7] See, *e. g., Independent Lock Co.,* 30 Lab. Arb. 744, 746 (1958): "[Participation by the union representative] might reasonably be designed to clarify the issues at this first stage of the existence of a question, to bring out the facts and the policies concerned at this stage, to give assistance to employees who may lack the ability to express themselves in their cases, and who, when their livelihood is at stake, might in fact need the more experienced kind of counsel which their union steward might represent. The foreman, himself, may benefit from the presence of the steward by seeing the issue, the problem, the implications of the facts, and the collective bargaining clause in question more clearly. Indeed, good faith discussion at this level may solve many problems, and prevent needless hard feelings from arising . . . . [It] can be advantageous to both parties if they both act in good faith and seek to discuss the question at

investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating factors. A knowledgeable union representative could assist the employer by eliciting favorable facts, and save the employer production time by getting to the bottom of the incident occasioning the interview. Certainly his presence need not transform the interview into an adversary contest. Respondent suggests nonetheless that union representation at this stage is unnecessary because a decision as to employee culpability or disciplinary action can be corrected after the decision to impose discipline has become final. In other words, respondent would defer representation until the filing of a formal grievance challenging the employer's determination of guilt after the employee has been discharged or otherwise disciplined.[8] At that point, however, it becomes increasingly difficult for the employee to vindicate himself, and the

---

this stage with as much intelligence as they are capable of bringing to bear on the problem."

See also *Caterpillar Tractor Co.*, 44 Lab. Arb. 647, 651 (1965):

"The procedure . . . contemplates that the steward will exercise his responsibility and authority to discourage grievances where the action on the part of management appears to be justified. Similarly, there exists the responsibility upon management to withhold disciplinary action, or other decisions affecting the employees, where it can be demonstrated at the outset that such action is unwarranted. The presence of the union steward is regarded as a factor conducive to the avoidance of formal grievances through the medium of discussion and persuasion conducted at the threshold of an impending grievance. It is entirely logical that the steward will employ his office in appropriate cases so as to limit formal grievances to those which involve differences of substantial merit. Whether this objective is accomplished will depend on the good faith of the parties, and whether they are amenable to reason and persuasion."

[8] 1 CCH Lab. L. Rep., Union Contracts, Arbitration ¶ 59,520, pp. 84,988–84,989.

value of representation is correspondingly diminished. The employer may then be more concerned with justifying his actions than re-examining them.

## IV

The Court of Appeals rejected the Board's construction as foreclosed by that court's decision four years earlier in *Texaco, Inc., Houston Producing Division* v. *NLRB,* 408 F. 2d 142 (1969), and by "a long line of Board decisions, each of which indicates—either directly or indirectly—that no union representative need be present" at an investigatory interview. 485 F. 2d, at 1137.

The Board distinguishes *Texaco* as presenting not the question whether the refusal to allow the employee to have his union representative present constituted a violation of § 8 (a) (1) but rather the question whether § 8 (a) (5) precluded the employer from refusing to deal with the union. We need not determine whether *Texaco* is distinguishable. Insofar as the Court of Appeals there held that an employer does not violate § 8 (a) (1) if he denies an employee's request for union representation at an investigatory interview, and requires him to attend the interview alone, our decision today reversing the Court of Appeals' judgment based upon *Texaco* supersedes that holding.

In respect of its own precedents, the Board asserts that even though some "may be read as reaching a contrary conclusion," they should not be treated as impairing the validity of the Board's construction, because "[t]hese decisions do not reflect a considered analysis of the issue." Brief for Petitioner 25.[9] In that circumstance, and in the

---

[9] The precedents cited by the Court of Appeals are: *Illinois Bell Telephone Co.,* 192 N. L. R. B. 834 (1971); *Texaco, Inc., Los Angeles Terminal,* 179 N. L. R. B. 976 (1969); *Wald Mfg. Co.,* 176 N. L. R. B. 839 (1969), aff'd, 426 F. 2d 1328 (CA6 1970); *Dayton*

light of significant developments in industrial life believed by the Board to have warranted a reappraisal of the question,[10] the Board argues that the case is one where "[t]he nature of the problem, as revealed by unfolding variant situations, inevitably involves an evolutionary process for its rational response, not a quick, definitive formula as a comprehensive answer. And so, it is not surprising that the Board has more or less felt its way . . . and has modified and reformed its standards on the basis of accumulating experience." *Electrical Workers* v. *NLRB*, 366 U. S. 667, 674 (1961).

We agree that its earlier precedents do not impair the validity of the Board's construction. That construction in no wise exceeds the reach of § 7, but falls well within the scope of the rights created by that section. The use by an administrative agency of the evolutional approach is particularly fitting. To hold that the Board's earlier decisions froze the development of this important aspect

*Typographic Service, Inc.*, 176 N. L. R. B. 357 (1969); *Jacobe-Pearson Ford, Inc.*, 172 N. L. R. B. 594 (1968); *Chevron Oil Co.*, 168 N. L. R. B. 574 (1967); *Dobbs Houses, Inc.*, 145 N. L. R. B. 1565 (1964). See also *NLRB* v. *Ross Gear & Tool Co.*, 158 F. 2d 607 (CA7 1947).

[10] "There has been a recent growth in the use of sophisticated techniques—such as closed circuit television, undercover security agents, and lie detectors—to monitor and investigate the employees' conduct at their place of work. See, *e. g., Warwick Electronics, Inc.*, 46 L. A. 95, 97–98 (1966); *Bowman Transportation, Inc.*, 56 L. A. 283, 286–292 (1972); *FMC Corp.*, 46 L. A. 335, 336–338 (1966). These techniques increase not only the employees' feelings of apprehension, but also their need for experienced assistance in dealing with them. Thus, often, as here and in *Mobil, supra*, an investigative interview is conducted by security specialists; the employee does not confront a supervisor who is known or familiar to him, but a stranger trained in interrogation techniques. These developments in industrial life warrant a concomitant reappraisal by the Board of their impact on statutory rights. Cf. *Boys Markets, Inc.* v. *Retail Clerks, Local 770*, 398 U. S. 235, 250." Brief for Petitioner 27 n. 22.

of the national labor law would misconceive the nature of administrative decisionmaking. " 'Cumulative experience' begets understanding and insight by which judgments . . . are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process." *NLRB* v. *Seven-Up Co.,* 344 U. S. 344, 349 (1953).

The responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board. The Court of Appeals impermissibly encroached upon the Board's function in determining for itself that an employee has no "need" for union assistance at an investigatory interview. "While a basic purpose of section 7 is to allow employees to engage in concerted activities for their mutual aid and protection, such a need does not arise at an investigatory interview." 485 F. 2d, at 1138. It is the province of the Board, not the courts, to determine whether or not the "need" exists in light of changing industrial practices and the Board's cumulative experience in dealing with labor-management relations. For the Board has the "special function of applying the general provisions of the Act to the complexities of industrial life," *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 236 (1963) ; see *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793, 798 (1945) ; *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 196–197 (1941), and its special competence in this field is the justification for the deference accorded its determination. *American Ship Building Co.* v. *NLRB,* 380 U. S., at 316. Reviewing courts are of course not "to stand aside and rubber stamp" Board determinations that run contrary to the language or tenor of the Act, *NLRB* v. *Brown,* 380 U. S. 278, 291 (1965). But the Board's construction here, while it may not be required by the Act, is at least permissible

under it, and insofar as the Board's application of that meaning engages in the "difficult and delicate responsibility" of reconciling conflicting interests of labor and management, the balance struck by the Board is "subject to limited judicial review." *NLRB* v. *Truck Drivers,* 353 U. S. 87, 96 (1957). See also *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956); *NLRB* v. *Brown, supra; Republic Aviation Corp.* v. *NLRB, supra.* In sum, the Board has reached a fair and reasoned balance upon a question within its special competence, its newly arrived at construction of § 7 does not exceed the reach of that section, and the Board has adequately explicated the basis of its interpretation.

The statutory right confirmed today is in full harmony with actual industrial practice. Many important collective-bargaining agreements have provisions that accord employees rights of union representation at investigatory interviews.[11] Even where such a right is not explicitly provided in the agreement a "well-established current of arbitral authority" sustains the right of union representation at investigatory interviews which the employee reasonably believes may result in disciplinary action against him. *Chevron Chemical Co.,* 60 Lab. Arb. 1066, 1071 (1973).[12]

---

[11] 1 BNA Collective Bargaining Negotiations and Contracts 21:22 (General Motors Corp. and Auto Workers, ¶ 76a); 27:6 (Goodyear Tire & Rubber Co. and Rubber Workers, Art. V (5)); 29:15–29:16 (United States Steel Corp. and United Steelworkers, §§ 8 B [8.4] and [8.7]). See, *e. g.,* the Bethlehem Steel Corp. and United Steelworkers Agreement of 1971, Art. XI, § 4 (d), which provided:

"Any Employee who is summoned to meet in an enclosed office with a supervisor for the purpose of discussing possible disciplinary action shall be entitled to be accompanied by the Assistant Grievance Committeeman designated for the area if he requests such representation, provided such representative is available during the shift."

[12] See also *Universal Oil Products Co.,* 60 Lab. Arb. 832, 834 (1973): "[A]n employee is entitled to the presence of a Committeeman at

The judgment is reversed and the case is remanded with direction to enter a judgment enforcing the Board's order.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, dissenting.*

Today the Court states that, in positing a new § 7 right for employees, the "Board has adequately explicated the basis of its interpretation." *Ante,* at 267. I agree that the Board has the power to change its position, but since today's cases represent a major change in policy and a departure from Board decisions spanning almost 30 years the change ought to be justified by a reasoned Board opinion. The brief but spectacular evolution of the right, once recognized, illustrates the problem. In *Quality Mfg. Co.,* 195 N. L. R. B. 197, 198 (1972), the Board distinguished its prior cases on the ground, *inter alia,* that "none of those cases presented a situation where an employee or his representative had been disciplined or discharged for requesting, or insisting on, union representation in the course of an interview." Yet, soon after-

---

an investigatory interview if he requests one and if the employee has reasonable grounds to fear that the interview may be used to support disciplinary action against him." *Allied Paper Co.,* 53 Lab. Arb. 226 (1969); *Thrifty Drug Stores Co., Inc.,* 50 Lab. Arb. 1253, 1262 (1968); *Waste King Universal Products Co.,* 46 Lab. Arb. 283, 286 (1966); *Dallas Morning News,* 40 Lab. Arb. 619, 623–624 (1963); *The Arcrods Co.,* 39 Lab. Arb. 784, 788–789 (1962); *Valley Iron Works,* 33 Lab. Arb. 769, 771 (1960); *Schlitz Brewing Co.,* 33 Lab. Arb. 57, 60 (1959); *Singer Mfg. Co.,* 28 Lab. Arb. 570 (1957); *Braniff Airways, Inc.,* 27 Lab. Arb. 892 (1957); *John Lucas & Co.,* 19 Lab. Arb. 344, 346–347 (1952). Contra, *e. g., E. I. duPont de Nemours & Co.,* 29 Lab. Arb. 646, 652 (1957); *United Air Lines, Inc.,* 28 Lab. Arb. 179, 180 (1956).

*[This opinion applies also to No. 73–765, *International Ladies' Garment Workers' Union, Upper South Department, AFL–CIO* v. *Quality Manufacturing Co. et al., post,* p. 276.]

wards the Board extended the right without explanation to situations where no discipline or discharge resulted. *Mobil Oil Corp.*, 196 N. L. R. B. 1052 (1972); *J. Weingarten Inc.*, 202 N. L. R. B. 446 (1973).

The tortured history and inconsistency of the Board's efforts in this difficult area suggest the need for an explanation by the Board of why the new rule was adopted. However, a much more basic policy demands that the Board explain its new construction. The integrity of the administrative process requires that "[w]hen the Board so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 197." *NLRB* v. *Metropolitan Ins. Co.*, 380 U. S. 438, 443 (1965). Here, there may be very good reasons for adopting the new rule, and the Court suggests some. See *ante,* at 260–261; 262–264; 265 n. 10. But these reasons are not to be found in the Board's cases. In *Metropolitan Ins. Co., supra,* at 444, we made it clear that " 'courts may not accept appellate counsel's *post hoc* rationalizations for agency action.' " The Court today gives lip service to the rule that courts are not " 'to stand aside and rubber stamp' " Board determinations. *Ante,* at 266.

I would therefore remand the cases to the Court of Appeals with directions to remand to the Board so that it may enlighten us as to the reasons for this marked change in policy rather than leave with this Court the burden of justifying the change for reasons which we arrive at by inference and surmise.

MR. JUSTICE POWELL, with whom MR. JUSTICE STEWART joins, dissenting.

Section 7 of the National Labor Relations Act, as amended, 61 Stat. 140, 29 U. S. C. § 157, guarantees to

employees the right to "engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." The Court today construes that right to include union representation or the presence of another employee[1] at any interview the employee reasonably fears might result in disciplinary action. In my view, such an interview is not *concerted activity* within the intendment of the Act. An employee's right to have a union representative or another employee present at an investigatory interview is a matter that Congress left to the free and flexible exchange of the bargaining process.

The majority opinion acknowledges that the NLRB has only recently discovered the right to union representation in employer interviews. In fact, as late as 1964— after almost 30 years of experience with § 7—the Board flatly rejected an employee's claim that she was entitled to union representation in a "discharge conversation" with the general manager, who later admitted that he had already decided to fire her. The Board adopted the Trial Examiner's analysis:

"I fail to perceive anything in the Act which obliges an employer to permit the presence of a representative of the bargaining agent in every situation where an employer is compelled to admonish or to otherwise take disciplinary action against an employee, particularly in those situations where the employee's conduct is unrelated to any legitimate union or concerted activity. An employer undoubtedly has the right to maintain day-to-day discipline in the plant or on the working premises and it seems

---

[1] While the Court speaks only of the right to insist on the presence of a union representative, it must be assumed that the § 7 right today recognized, affording employees the right to act "in concert" in employer interviews, also exists in the absence of a recognized union. Cf. *NLRB* v. *Washington Aluminum Co.*, 370 U. S. 9 (1962).

to me that only exceptional circumstances should warrant any interference with this right." *Dobbs Houses, Inc.*, 145 N. L. R. B. 1565, 1571 (1964).[2]

The convoluted course of litigation from *Dobbs Houses* to *Quality Mfg.* hardly suggests that the Board's change of heart resulted from a logical "evolutional approach." *Ante,* at 265. The Board initially retreated from *Dobbs Houses,* deciding that it only applied to "investigatory" interviews and holding that if the employer already had decided on discipline the union had a § 8 (a)(5) right to attend the interview. *Texaco, Inc., Houston Producing Division,* 168 N. L. R. B. 361 (1967), enforcement denied, 408 F. 2d 142 (CA5 1969). It reasoned that employee discipline sufficiently affects a "term or condition of employment" to implicate the employer's obligation to consult with the employee's bargaining representative, and that direct dealing with an employee on an issue of discipline violated § 8 (a)(5).[3] For several years, the Board adhered to its distinction between "investigative" and "disciplinary" interviews, dismissing claims under both

---

[2] In one earlier case the Board had found a § 8 (a)(1) violation in the employer's refusal to admit a union representative · to an interview. *Ross Gear & Tool Co.,* 63 N. L. R. B. 1012, 1033–1034 (1945), enforcement denied, 158 F. 2d 607, 611–614 (CA7 1947). In that case, however, the Board found that the employee, a union committee member; was called in to discuss a pending union issue. The Board found that discharging her for insisting on the presence of the entire committee was a discriminatory discharge under § 8 (a)(1). The opinion in *Dobbs Houses* distinguished *Ross Gear* on the ground that the matter under investigation was protected union activity. 145 N. L. R. B., at 1571.

[3] The Board has not been called upon to pursue its § 8 (a)(5) theory to its logical conclusion. Its determination that all disciplinary decisions are matters that invoke the employer's mandatory duty to bargain would seem to suggest that, absent some qualification of the duty contained in the collective-bargaining agreement, federal law will now be read to require that the employer bargain

§ 8 (a)(1) and § 8 (a)(5) in the absence of evidence that the employer had decided to discipline the employee.[4]

*Quality Mfg. Co.* was the first case in which the Board perceived any greater content in § 7. It did so, not by relying on "significant developments in industrial life," *ante,* at 265, but by stating simply that in none of the earlier cases had a worker been fired for insisting on union representation. The Board also asserted, for the first time, that its earlier decisions had disposed of only the union's right to bargain with the employer over the discipline to be imposed, and had not dealt with the employee's right under § 7 to insist on union presence at meetings that he reasonably fears would lead to disciplinary action. 195 N. L. R. B. 197, 198. Even this distinction was abandoned some four months later in *Mobil Oil Corp.,* 196 N. L. R. B. 1052 (1972), enforcement denied, 482 F. 2d 842 (CA7 1973). There the Board followed *Quality Mfg.,* even though the employees in *Mobil Oil* had not been fired for insisting on union representation and their only claim was that the employer had excluded the union from an investigatory interview. Thus, the Board has turned its back on *Dobbs Houses* and now finds a § 7 right to insist on union presence in the absence of any evidence that the employer has decided to embark on a course of discipline.

Congress' goal in enacting federal labor legislation was to create a framework within which labor and manage-

---

to impasse before initiating unilateral action on disciplinary matters. It is difficult to believe that Congress intended such a radical restriction of the employer's power to discipline employees. See *Fibreboard Corp.* v. *NLRB,* 379 U. S. 203, 217, 218, 223 (1964) (STEWART, J., concurring).

[4] *Lafayette Radio Electronics,* 194 N. L. R. B. 491 (1971); *Illinois Bell Telephone Co.,* 192 N. L. R. B. 834 (1971); *Texaco, Inc., Los Angeles Terminal,* 179 N. L. R. B. 976 (1969); *Jacobe-Pearson Ford, Inc.,* 172 N. L. R. B. 594 (1968); *Chevron Oil Co.,* 168 N. L. R. B. 574 (1967).

ment can establish the mutual rights and obligations that govern the employment relationship. "The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel." *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 45 (1937). The National Labor Relations Act only creates the structure for the parties' exercise of their respective economic strengths; it leaves definition of the precise contours of the employment relationship to the collective-bargaining process. See *Porter Co.* v. *NLRB,* 397 U. S. 99, 108 (1970); *NLRB* v. *American National Insurance Co.,* 343 U. S. 395, 402 (1952).

As the Court noted in *Emporium Capwell Co.* v. *Western Addition Community Organization,* § 7 guarantees employees' basic rights of industrial self-organization, rights which are for the most part "collective rights . . . to act in concert with one's fellow employees, [which] are protected, not for their own sake, but as an instrument of the national labor policy of minimizing industrial strife 'by encouraging the practice and procedure of collective bargaining.' " *Ante,* at 62. Section 7 protects those rights that are essential to employee self-organization and to the exercise of economic weapons to exact concessions from management and demand a voice in defining the terms of the employment relationship.[5] It does not define those terms itself.

The power to discipline or discharge employees has been recognized uniformly as one of the elemental prerogatives of management. Absent specific limitations

---

[5] By contrast, the employee's § 7 right announced today may prove to be of limited value to the employee or to the stabilization of labor relations generally. The Court appears to adopt the Board's view that investigatory interviews are not bargaining sessions and

imposed by statute [6] or through the process of collective bargaining,[7] management remains free to discharge employees at will. See *Steelworkers* v. *Warrior & Gulf Co.*, 363 U. S. 574, 583 (1960). An employer's need to consider and undertake disciplinary action will arise in a wide variety of unpredictable situations. The appropriate disciplinary response also will vary significantly, depending on the nature and severity of the employee's conduct. Likewise, the nature and amount of information required for determining the appropriateness of disciplinary action may vary with the severity of the possible sanction and the complexity of the problem. And in some instances, the employer's legitimate need to maintain discipline and security may require an immediate response.

This variety and complexity necessarily call for flexible and creative adjustment. As the Court recognizes, *ante,* at 267, the question of union participation in investigatory

that the employer legitimately can insist on hearing only the employee's version of the facts. Absent employer invitation, it would appear that the employee's § 7 right does not encompass the right to insist on the participation of the person he brings with him to the investigatory meeting. The new right thus appears restricted to the privilege to insist on the mute and inactive presence of a fellow employee or a union representative; a witness to the interview, perhaps.

[6] Section 8 (a) (1) forbids employers to take disciplinary actions that "interfere with, restrain, or coerce" the employee's exercise of § 7 rights. Other federal statutes also limit in certain respects the employer's basic power to discipline and discharge employees. See, e. g., § 706 of the Civil Rights Act of 1964, 78 Stat. 259, 42 U. S. C. § 2000e–5; Age Discrimination in Employment Act of 1967, 81 Stat. 602, 29 U. S. C. § 623.

[7] The Board and the courts have recognized that union demands for provisions limiting the employer's power to discharge can be the subject of mandatory bargaining. See *Fibreboard Corp.* v. *NLRB,* 379 U. S., at 217, 221–223 (STEWART, J., concurring).

interviews is a standard topic of collective bargaining.[8] Many agreements incorporate provisions that grant and define such rights, and arbitration decisions increasingly have begun to recognize them as well. Rather than vindicate the Board's interpretation of § 7, however, these developments suggest to me that union representation at investigatory interviews is a matter that Congress left to the bargaining process. Even after affording appropriate deference to the Board's meandering interpretation of the Act, I conclude that the right announced today is not among those that Congress intended to protect in § 7. The type of personalized interview with which we are here concerned is simply not "concerted activity" within the meaning of the Act.

---

[8] The history of a similar case, *Mobil Oil*, 196 N. L. R. B. 1052 (1972), enforcement denied, 482 F. 2d 842 (CA7 1973), illustrates how the Board has substituted its judgment for that of the collective-bargaining process. During negotiations leading to the establishment of a collective-bargaining agreement in that case, the union advanced a demand that existing provisions governing suspension and discharge be amended to provide for company-union discussions prior to disciplinary action. The employer refused to accede to that demand and ultimately prevailed, only to find his efforts at the bargaining table voided by the Board's interpretation of the statute.

Chairman Miller subsequently suggested that the union can waive the employee's § 7 right to the presence of a union representative. See *Western Electric Co.*, 198 N. L. R. B. 82 (1972). The Court today provides no indication whether such waivers in the collective-bargaining process are permissible. Cf. *NLRB* v. *Magnavox Co.*, 415 U. S. 322 (1974).