**CITY OF READING, Petitioner,**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 9, 1996.
Decided Feb. 10, 1997.

David A. Binder, Reading, for petitioner.

Elizabeth Kelly, Harrisburg, for respondent.

Gary M. Lightman, Harrisburg, for intervenor, Reading Lodge No. 9, Fraternal Order of Police.

Before COLINS, President Judge, DOYLE, J., and LORD, Senior Judge.

LORD, Senior Judge.

The City of Reading (City) appeals a Pennsylvania Labor Relations Board (PLRB) decision adopting a hearing examiner's proposed decision and order and finding that the City committed an unfair labor practice.[1]

Those facts giving rise to this controversy which are *not* in dispute are succinctly stated in the PLRB final order. The City police department retrieved a videotape, which appeared to be a piece of evidence in a criminal matter Police Officer Walter Balkiewicz investigated, from a patrol car on the day after Balkiewicz's investigation. Balkiewicz's supervisor, Lieutenant Delewski, was directed by his Captain to investigate the circumstances surrounding the recovered piece of evidence. Lieutenant Delewski asked Balkiewicz to submit a memorandum explaining his role in the incident. Balkiewicz asked Delewski if disciplinary action would follow the submission of the memorandum. Delewski answered that discipline was very well possible. Balkiewicz then asked that a representative of his union be present. Delewski answered this request by stating that he was not authorized to call for a union representative on overtime. Delewski did not make any other response. Balkiewicz submitted the memorandum without union assistance, accompanied by a preprinted form in which he asserted a violation of his right to union representation.

At issue is whether the City committed an unfair labor practice by subjecting Officer Balkiewicz to an investigatory interview without affording him the opportunity to have a union representative present. The right conferred by the Section 7 of the National Labor Relations Act, 29 U.S.C § 157, to union representation when an investigatory interview may lead to disciplinary action against an employee was enunciated and described by the United States Supreme Court in *National Labor Relations Board v. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). The rule of law announced in *Weingarten* has been followed by the PLRB and this Court, *American Federation of State, County and Municipal Employees v. Pennsylvania Labor Relations Board*, 100 Pa.Cmwlth. 50, 514 A.2d 255 (1986), pursuant to the parallel provision of the Pennsylvania Labor Relations Act, Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. §§ 211.1–211.13 (PLRA). Section 5 of that

---

1. The Fraternal Order of Police, Reading Lodge No. 9, has intervened in support of the respon-   dent PLRB's position.

statute confers on employees the right to self-organize, to bargain collectively, and "to engage in concerted activities for the purpose of ... mutual aid or protection." 43 P.S. § 211.5. Section 6(1)(a) declares it an unfair labor practice to interfere, restrain or coerce employees in the exercise of those rights. 43 P.S. § 211.6(1)(a). The PLRA applies to municipal police and firefighter employees covered by Act 111[2] insofar as those two statutes, which are otherwise *in pari materia*, do not conflict. *Commonwealth v. State Conference of State Police Lodges of the Fraternal Order of Police*, 88 Pa.Cmwlth. 356, 489 A.2d 317, 319 (1985) (citing *Philadelphia Fire Officers Association v. Pennsylvania Labor Relations Board*, 470 Pa. 550, 369 A.2d 259 (1977)).[3]

In *Weingarten*, the United States Supreme Court endorsed the National Labor Relations Board's statutory construction of the federal law guaranteeing the right to union participation in investigatory interviews of employees. First, the right to a union representative's assistance is based on the statutory guarantee that employees may act in concert for mutual aid and protection. Second, the right arises only when the employee requests representation. Third, the right is limited to situations where the employee reasonably believes the investigation will result in disciplinary action. Fourth, the right may not interfere with the employer's legitimate prerogative to continue his investigation without interviewing the employee. Finally, the employer has no duty to bargain in any way with a union representative who may be permitted to attend. *Id.*, at 256–260, 95 S.Ct. at 963–965.

None of the parties disputes that the *Weingarten* principle controls the question on appeal. The City does, however, take issue with the factual finding that the City made a *demand* of Officer Balkiewicz to submit a memorandum explaining his mishandling of the evidence. It also challenges the

conclusion that the "voluntary submission of a memorandum is equivalent to a [*Weingarten*] investigatory interview," thus requiring the City to allow union representation, to offer Balkiewicz the choice of continuing without representation or to terminate the proceeding.

■ Our scope of review of a PLRB final order is limited to determining whether there has been a constitutional violation, an error of law, or whether the findings of fact are supported by substantial evidence on the record. *City of Harrisburg v. Pennsylvania Labor Relations Board*, 146 Pa.Cmwlth. 242, 605 A.2d 440 (1992).

■ We first dispense with any suggestion that a directive to an employee to make a statement or memorandum in writing and not in a superior's presence, as opposed to a face-to-face interview, removes that directive from the *Weingarten* protection of union representation. Like its parallel federal statute, the PLRA expressly declares it to be Pennsylvania's public policy to encourage "self-organization" and the "designation of representatives . . . for the purpose of . . . mutual aid or protection, free from the interference, restraint or coercion of their employers." 43 P.S. § 211.2(c). We see no distinction between a face-to-face interview preliminary to disciplinary action and a requested memorandum which could likewise be used by an employer to initiate disciplinary action. We see no reason why in either case, the PLRA's right to "designation of a representative for mutual aid or protection" should not be invoked; the interests of the employee and the employer are the same. The rationale articulated in *Weingarten* that "[a] single employee confronted by an employer investigating whether certain conduct deserves discipline may be too fearful or inarticulate to relate accurately the incident being investigated, or too ignorant to raise extenuating circumstances," *id.* at 262–263, 95 S.Ct. at 966, is

2. Act of June 24, 1968, P.L. 237, No. 111, *as amended*, 43 P.S. §§ 217.1–217.10, commonly referred to as "Act 111."

3. In *Philadelphia Fire Officers* our Supreme Court noted that Act 111 deals with collective bargaining rights, but for a limited group of public employees, and contains none of the de-

tailed provisions of the PLRA. The Court concluded that the two statutes should, within certain limits, be construed in conjunction with each other. *See also Commonwealth v. Pennsylvania Labor Relations Board*, 120 Pa.Cmwlth. 336, 549 A.2d 240 (1988).

equally applicable in both circumstances, for it is obvious that not all confrontations, especially in a personnel context, take place in person. The declared purpose of the PLRA should not be so easily circumvented—by the simple act of putting the questions and answers of an investigatory interview to paper. If an employee is required to submit a memorandum and has a reasonable basis to fear that an adverse impact on his employment may thus result, *Weingarten* is invoked.

■ While there is no doubt that Officer Balkiewicz's fear of the memorandum's adverse impact was reasonable, since in fact Lieutenant Delewski told him that such a result could well occur, the question remains as to whether Officer Balkiewicz was compelled to submit it. This question is critical to the disposition of the appeal here, because "it is a serious violation of the employee's individual right to engage in concerted activity by seeking the assistance of his statutory representative if the employer denies the employee's request *and* compels the employee to appear unassisted at an interview which may put his job security in jeopardy." *Weingarten*, 420 U.S. at 257, 95 S.Ct. at 963 (emphasis added).

■ The City does not seriously question the finding that Lieutenant Delewski's response to Officer Balkiewicz's request for a union representative—that he, Delewski, was not authorized to call out a representative on overtime—was an effective denial of the request. At that point, *Weingarten* dictates that the employer give the employee the choice of continuing the interview without representation or that the employer terminate the interview and proceed with the investigation without an interview, thus leaving to *the employee* the choice between having an interview unaccompanied by his representative, or having no interview and forgoing any benefits that might be derived from one. *Id.*, at 258, 95 S.Ct. at 964.

We return to the record to ascertain if the PLRB's findings of fact are supported by the evidence. The hearing examiner's proposed decision and order (PDO) contains the following finding:

That between October 13 and 21, 1994, Captain Gery told Lieutenant Delewski on three separate occasions that Officer Balkiewicz was to be given the option of explaining his disposition of the video cassette and that Officer Balkiewicz was not to be ordered to do so. Captain Gery was hoping to avoid a repeat of an August 1994 incident where Officer Balkiewicz asserted a right to union representation when he was ordered by Lieutenant Delewski to submit a memorandum on that occasion.

(Finding of Fact No. 6, PDO, March 29, 1995).

The PLRB amended the hearing examiner's findings and made additional findings of its own.

That on October 21, 1994, Officer Balkiewicz was asked by Lieutenant Delewski to submit to a memorandum explaining his disposition of the video cassette. Officer Balkiewicz asked if his discipline would be imposed on him after he submitted the memorandum. Lieutenant Delewski responded that discipline was "very well possible". After Lieutenant Delewski's response, Officer Balkiewicz asked to be represented by the FOP. Lieutenant Delewski said that he was not authorized to call out an FOP representative on overtime. This was Lieutenant Delewski's sole response to Officer Balkiewicz's requests for an FOP representative.

That Officer Balkiewicz was "scared" and "nervous" and he feared that if he refused the lieutenant's request he would receive more severe punishment than would actually be imposed for the underlying offense. Lieutenant Delewski's manner of obtaining the memorandum from Officer Balkiewicz conveyed to him that he was *required to* submit the memorandum.

That in August 1994, Officer Balkiewicz refused to submit a memorandum which Lieutenant Delewski ordered, and Lieutenant Delewski told Officer Balkiewicz that if he disobeyed he would receive a more severe punishment than would normally be imposed.

That on October 21, 1994, Officer Balkiewicz submitted the memorandum as requested. A telephone was at his disposal before

he did so. Balkiewicz attached a preprinted form to the memorandum which asserted a violation of his *Weingarten* right.

(Findings of Fact Nos. 7–10, PLRB Final Order, July 18, 1995).

The City contends that there is no evidentiary support for the finding that Officer Balkiewicz was compelled to submit the memorandum. Lieutenant Delewski, for the City, and Officer Balkiewicz testified as to what transpired. Lieutenant Delewski testified as follows:

Q. Can you describe the events that actually took place that evening of the 21st, when you did have Officer Balkiewicz come in and interact with him regarding the memorandum?

A. Yes. I had managed to see Officer Balkiewicz about that date. One of the most——to make or reserve——and the second one was to ask you to do this memorandum.

Q. Did you, in any way, order him to submit the memorandum?

A. Absolutely not.

Q. Did you compel him?

A. Absolutely not.

Q. Do you recollect that your demeanor was such that he would feel threatened or have a compulsion to submit that memorandum no matter what his own personal feelings may be?

A. No.

Q. Can you describe what the purpose of the memorandum would have been and was with regard to the request——the option, the choice that was given to him?

A. Well, Captain Gery felt he needed it. He really didn't need it. Officer Balkiewicz——

. . . .

Q. Could you describe for us the circumstances relating to your interaction with Officer Balkiewitz [sic] and his ultimate submission of the memorandum. And what I'd like you to talk about is what he actually did. Was he compelled to remain there? Was he able to do other things

other than sit at a typewriter and type this memorandum?

A. He asked me if this could result in discipline and I said I think it very well could. And then he asked me if——he sat down. So after the interview, he left the office, left the squad room. And then a short time later I left to go back——he came back into my office at two o'clock.

Q. That was two o'clock the following afternoon?

A. Yes.

Q. So then it would be your testimony that you were not submitted copies of these memorandums immediately, that there appeared to be a fairly substantial amount of time, several hours at a minimum, that passed between when you initially mentioned——discussed with Officer Balkiewicz that he had the opportunity to provide the memorandum to when you—— it would have actually been laid upon your desk?

A. Yes.

(Notes of Testimony (N.T.), Hearing Examiner's hearing, January 27, 1995, pp. 61–63).

On the other hand, Officer Balkiewicz offered his version of events.

Q. Do you recall a time that evening when Lieutenant Velewski [sic] requested to see you?

A. Yes. I was ordered by radio to report to the OD's office.

Q. And what is the OD?

A. That's the Officer of the Day. That's the title that he held.

Q. And did you report there?

A. Yes, sir, I did.

Q. And could you please describe what happened upon your reporting?

A. I was advised by Lieutenant Velewski [sic] that I must submit a memo in regards to an incident that occurred where I had been accused of losing some evidence on a particular evening.

Q. And what information was requested in this memorandum?

A. I was ordered to submit a memorandum to the facts of the——

Q. And did you inquire of Lieutenant Ve-lewski [sic] as to whether submission of such a memorandum could result in disciplinary measures being——

A. Yes, sir, I did.

Q. And what was his response?

A. I asked if submitting this memo would result in a disciplinary action and he said it's very well possible.

Q. Now, at this point did you believe that the information requested could be used against you in a disciplinary action?

A. Yes, sir.

Q. And what did you do at this point?

A. I'd have the opportunity to be represented by a lodge representative.

Q. And what was the response?

A. He said he was sorry he wasn't able to do that, he was not authorized by the Captain to put overtime into that.

(N.T., January 27, 1995, pp. 13–14).

. . . .

Q. Based upon what's been identified as FOP Number One, do you understand that you were not required to submit to an interview if you didn't have representation?

A. No. I was under the understanding that this was a direct order and it had to be done immediately.

Q. Now, why were you under the impression that this was a direct order?

A. Dealing with Lieutenant Velewski [sic] in the past in incidents that had occurred from past incidents, I was denied representation on another occasion. And the way the Lieutenant looked at me, his demeanor, his order to me was a direct order to submit this memo. When I did this—when I invoked Mike Garretty (phonetic) and the Winegarden [sic] was in a past incident, I received——I was recommended to receive more severe punishment as a result of the occurrence on this. So I thought that if I did not follow these orders this time, that I would receive a more severe punishment again, had I not submitted this memo.

Q. When did this prior incident occur?

A. That was in——I believe in August.

(N.T., January 27, 1995, pp. 18–19).

In addition, on cross-examination, Officer Balkiewicz testified:

Q. Your recollection of the evening of the 21st, the night that the memo issue arose, it is your testimony that you specifically recall being ordered to submit a memorandum?

A. Anytime the Officer tells me to do something it becomes an order. And I followed the orders that were given to me.

Q. Did he use any language of a nature that would indicate that he was insisting or compelling you to submit that memorandum?

A. Yes.

Q. Of what nature? What were the words? Do you specifically recall the language that was used?

A. That he needed for me to submit a memo in regards to the false evidence. That was an order to me.

Q. Did he give you any specific time period within which you could submit the memorandum?

A. No.

Q. Did you have the opportunity to leave?

A. I wouldn't. Not at that point, no.

Q. Did you have the opportunity to use the phone if you wanted to?

A. It was at my disposal, yes. It's right at the desk right where we were talking. I didn't want to take a chance at this time.

(N.T., January 27, 1995, pp. 27–28).

Balkiewicz's testimony, while no doubt contradicted by that of Lieutenant Delewski, substantially supports the PLRB's finding that Lieutenant Delewski's manner of obtaining the memorandum conveyed that it was required—that the memorandum was compelled. Our scope of review permits us to go no further in our inquiry into the evidence. Having reviewed the countervailing testimony of both sides in its entirety, we can certainly say that the evidence permits the PLRB's finding of compulsion, if it does not require it.

Moreover, the record is *devoid* of any evidence that Lieutenant Delewski affirmatively advised Officer Balkiewicz that the memorandum was purely voluntary, or that he had the choice of submitting a memorandum without the assistance of a union representative or discontinuing the process.[4] Not only are these omissions remarkable, given the City's insistence that it was simply "offering Officer Balkiewicz an opportunity to submit his version of events," but the making of such statements is also what *Weingarten,* as we understand it, requires.

We therefore hold that the PLRB's findings are supported by substantial evidence and that it has committed no error of law in concluding that the City committed an unfair labor practice.

Accordingly, we affirm the PLRB final order.

### ORDER

AND NOW, this 10th day of February, 1997, the final order of the Pennsylvania Labor Relations Board in the above-captioned matter, dated July 18, 1995, is hereby affirmed.

**4.** Lieutenant Delewski testified not that he terminated the session, but that he and Officer Balkiewicz parted company after Delewski said he was not authorized to call a union representative. (N.T. January 1, 27, 1995, p. 63).