39 F.3d 361
 147 L.R.R.M. (BNA) 2712, 309 U.S.App.D.C.
84, 63 USLW 2305
 UNITED STATES DEPARTMENT OF JUSTICE; Immigration and
Naturalization Service, Northern Region, Twin Cities,
Minnesota; Office of Inspector General, Washington, D.C.;
and Office of Professional Responsibility, Washington, D.C.,
Petitioners,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
National Border Patrol Council; American Federation of
Government Employees, AFL-CIO, Intervenors.
 No. 93-1284.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 8, 1994.
Decided Nov. 4, 1994.
Rehearing Denied Jan. 6, 1995.
 
 Petition for Review and Cross-Application for Enforcement of an Order of the Federal Labor Relations Authority.
 Howard S. Scher, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for petitioners. With him on the briefs were Frank W. Hunger, Asst. Atty. Gen., and William Kanter, William C. Owen and Scott D. Cooper, Attys., U.S. Dept. of Justice, Washington, DC. Wendy M. Keats, Washington, DC, entered an appearance.
 David M. Smith, Sol., Federal Labor Relations Authority, Washington, DC, argued the cause, for respondent. With him on the brief were William R. Tobey, Deputy Sol., and Richard Zorn, Atty., Federal Labor Relations Authority, Washington, DC.
 Alexia F. McCaskill, Charles A. Hobbie, Washington, DC, and Mark D. Roth, Chicago, IL, entered appearances, for intervenors Nat. Border Patrol Council and American Federation of Government Employees, AFL-CIO.
 Before: BUCKLEY, SENTELLE, and RANDOLPH, Circuit Judges.
 Opinion for the court filed by Circuit Judge RANDOLPH.
 RANDOLPH, Circuit Judge:
 
 
 1
 A federal law enforcement officer came under investigation by his department's Office of Inspector General. A collective bargaining agreement existed between the officer's union and a departmental agency for whom the officer worked. The Inspector General operated independently of the agency. The principal questions are whether the Inspector General, during formal questioning of the law enforcement officer, committed unfair labor practices by denying the officer permission to consult privately with his union representative and by forcing the officer to testify about his conversations with his union representative.
 
 
 2
 * In early 1990, the Office of Inspector General in the Department of Justice opened an investigation of Border Patrol Agent Jason S. Wood of the Immigration and Naturalization Service, an agency within the Justice Department. Wood, who worked at the Plentywood, Montana, Border Patrol Office, was suspected of selling government-owned ammunition, falsifying his time and attendance records, and gambling and abusing alcohol.
 
 
 3
 The statutory authority to investigate law enforcement personnel employed at the Justice Department rests with the Department's Office of Professional Responsibility (OPR) (see 5 U.S.C.App. Sec. 8E(b)(3) (Supp. V 1993)). The Office of Inspector General conducts investigations of such individuals for OPR pursuant to a memorandum of understanding between the two offices.
 
 
 4
 The Inspector General utilized Edward L. Nelson, an assistant Chief Patrol Agent of the Service, to conduct the investigation of Wood. It is agreed that while Nelson performed his duties for the Inspector General, the Immigration and Naturalization Service could not direct or control him.
 
 
 5
 The National Border Patrol Council, American Federation of Government Employees, AFL-CIO, served as the collective bargaining representative of a bargaining unit including Wood and other agents in the region. The union had a collective bargaining agreement with the Service. When Wood got wind of the investigation, he spoke with Jerry Gillies, a vice president of the union and, like Wood, a Border Patrol Agent. During their conversations in January 1990 and on July 15 and 16, 1990, Wood supplied details about his conduct. Gillies gave advice to Wood, told him that Nelson--who was in town--was an investigator for the Inspector General, and informed Wood of the procedures that would be followed when he submitted to an interview.
 
 
 6
 On July 15, 1990, while Wood and Gillies were talking on the telephone, Nelson arrived at Wood's home. Nelson told Wood that he was under investigation and instructed him to appear for an "investigative examination." The next day, Nelson spoke with an Assistant United States Attorney regarding the possibility of prosecuting Wood for stealing government property. The prosecutor believed he did not have enough evidence to prove that the government owned the ammunition Wood sold. When Nelson mentioned that Wood may have talked to Gillies about the ammunition, the prosecutor requested Nelson to interview Gillies. Nelson did so by telephone on July 17, 1990, with another special agent of the Office of Inspector General.
 
 
 7
 Gillies was reluctant to give any information to Nelson. He said he had been acting as a union representative when Wood talked with him and thought their conversations were privileged. Nelson responded that no such privilege existed and warned Gillies that if he refused to answer, his security clearance might be revoked, and he could be subject to disciplinary action. Answering Nelson's questions, Gillies supplied information about Wood's selling ammunition, falsifying time and attendance records, gambling and other matters, all of which Gillies had learned from Wood in their talks.
 
 
 8
 On July 18, 1990, Nelson conducted his "investigative examination" of Wood under oath and on the record. (By then, the Assistant United States Attorney had reviewed the results of the Gillies interview and had determined not to prosecute Wood.) William Hagen, another Border Patrol Agent, accompanied Wood as his union representative. Nelson advised Wood that he would be required to testify about allegations of misconduct. He warned Wood that anything he said could be used against him in administrative disciplinary proceedings but not in criminal proceedings unless he testified falsely, and that if he refused to answer, "this may subject you to revocation of any security clearance you may hold as well as disciplinary action up to and including removal from the Service." After administering an oath to Wood, Nelson questioned him about the ammunition sales and other matters, including Wood's conversations with Gillies and Wood's conducting an unauthorized investigation of Nelson. Twice Hagen requested an adjournment so that he could meet privately with Wood. Both times Nelson denied the request.
 
 
 9
 Nelson provided the results of his investigation to an Office of Inspector General "coordinator" in the Service's regional office. Thereafter, the Inspector General supplied a copy of Nelson's written report to the Service. The Service notified Wood that it proposed to remove him on the grounds that he had stolen government property; had falsified, misstated, exaggerated, or concealed material facts in connection with an investigation or other proper proceeding; and had engaged in conduct unbecoming an officer. Representing Wood in the disciplinary proceeding, the union forwarded requests to the Service for five different types of documentary material " '[i]n order to properly respond to the allegations set forth in the notice' of proposed removal." The Service provided some, but not all, of the information. At the conclusion of proceedings, the Service decided to suspend Wood for five days.
 
 
 10
 On a complaint brought by the General Counsel of the Federal Labor Relations Authority at the union's urging, the Administrative Law Judge ruled that the Office of Inspector General and OPR had committed unfair labor practices in violation of the Federal Service Labor-Management Relations Statute, 5 U.S.C. Sec. 7116(a)(1) and (8), by Nelson's refusing to permit Wood and his union representative to have private conferences during Wood's examination; by generally restricting the union representative during the examination; and by questioning Wood and Gillies about their "privileged" conversations. As to the Office of Inspector General and OPR, the Federal Labor Relations Authority adopted the ALJ's findings and conclusions as its own. With respect to the Immigration and Naturalization Service, the Authority agreed with the ALJ that the Service violated section 7116(a)(1), (5), and (8) by failing to provide the union with information it had requested pursuant to 5 U.S.C. Sec. 7114(b)(4). U.S. Department of Justice & National Border Patrol Council, 46 F.L.R.A. 1526 (1993).
 
 
 11
 The case is here on a petition for review brought by the Office of Inspector General, OPR and the Service, and on the Authority's cross-application for enforcement.
 
 II
 
 12
 The first issue is whether the Office of Inspector General (and OPR) committed an unfair labor practice when its investigator, Nelson, refused to allow the union representative to confer privately with Wood during the interrogation.[1]
 
 
 13
 The Federal Service Labor-Management Relations Statute makes it an unfair labor practice "for an agency--(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under" that Statute. 5 U.S.C. Sec. 7116(a)(1). As the Authority saw the case, the "right" the Office of Inspector General (and OPR) transgressed was that secured by section 7114(a)(2)(B), which states:(2) An exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at--
 
 
 14
 (B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if--
 
 
 15
 (i) the employee reasonably believes that the examination may result in disciplinary action against the employee; and
 
 
 16
 (ii) the employee requests representation.
 
 
 17
 5 U.S.C. Sec. 7114(a)(2)(B).
 
 
 18
 We take as givens that the examination of Wood was, in section 7114(a)(2)(B)'s terms, "in connection with an investigation"; that Wood had "request[ed union] representation"; and that he "reasonably believe[d] ... disciplinary action" might result. We shall also assume arguendo that the section 7114(a)(2)(B) right to union "representation" prevents an "agency" from barring private conferences between its employee and the attending union member during an examination.[2] Still, the Authority's conclusion that the Office of Inspector General committed an unfair labor practice does not necessarily follow. To reach that result it also must appear that in questioning Wood, the Inspector General's investigator acted on behalf of the "agency" mentioned in sections 7114(a)(2)(B) and 7116(a).[3]
 
 
 19
 "Agency," as used in the Statute, "means an Executive agency." 5 U.S.C. Sec. 7103(a)(3). "Executive agency" is "an Executive department ... and an independent establishment." 5 U.S.C. Sec. 105. An "independent establishment" is "an establishment in the executive branch ... which is not an Executive department." 5 U.S.C. Sec. 104(1).
 
 
 20
 In light of these definitions, the Authority's decision encounters considerable semantic difficulty. The Authority obviously did not view Wood's direct employing agency--the Immigration and Naturalization Service--as the "agency" mentioned in section 7114(a)(2)(B), and for good reason. The Service could not direct the investigator, and it had no control over him. Under section 7114(a)(2)(B), the Department of Justice could not have been the "agency" that deprived Wood of his right. The Justice Department is an "Executive Department" and thus itself an "agency" (5 U.S.C. Secs. 7103(a)(3) & 105), but the Authority sustained the ALJ's ruling that the Justice Department was not "responsible" for the violation of section 7114(a)(2)(B) and dismissed Justice from the case.
 
 
 21
 Therefore, the only section 7114(a)(2)(B) "agency" must have been the Office of Inspector General.[4] The Inspector General's Office plainly qualifies as an "agency" because it is an "independent establishment" and "not an Executive department" (5 U.S.C. Sec. 104(1)). But just as plainly, in this case it could not have been the "agency" section 7114(a)(2)(B) contemplates. The union here was not, in the language of section 7114(a)(2)(B), the "exclusive representative of an appropriate unit in the agency," that is, in the Office of Inspector General.[5] The bargaining unit was in the Service. It might have been viewed as simultaneously "in" the parent "agency," the Department of Justice. But by no means could the bargaining unit be considered to be in the Office of Inspector General.
 
 
 22
 The ALJ's contrary conclusion rested on Defense Criminal Investigative Services v. FLRA, 855 F.2d 93 (3d Cir.1988),[6] and on the fact that the Inspector General's investigator and Wood were "employed by the same parent agency, DOJ...." We understand how, under a theory akin to respondeat superior, the Authority might think this rendered the Justice Department guilty of violating section 7114(a)(2)(B).[7] But we cannot understand how this would render the Office of Inspector General the offending "agency." The error in the Authority's treating this factor--"employed by the same parent agency, DOJ"--as decisive becomes all the more apparent when one considers that United States Attorneys are also employees of the Justice Department. So are FBI agents and agents of the Drug Enforcement Administration. A criminal investigation, having a Justice Department employee as its target, could lead to an indictment and conviction. It also could result in the employee's being disciplined. The facts of this case are enough to show that criminal and civil investigations often proceed together.[8] Are we to suppose that the Federal Labor Relations Authority, through its administration of section 7114(a)(2)(B) and the prospect of the Justice Department being held responsible for the investigation, may oversee questioning by FBI agents and DEA agents[9] and Assistant United States Attorneys in cases involving union members? It is impossible to believe Congress intended anything of the sort. Yet we see no principled distinction between the hypothetical and the situation in front of us. If, as the Authority suggests, union members may interpose section 7114(a)(2)(B) on the ground that the Justice Department is the "agency" and another employee of the Department is doing the questioning, the same would hold true in an FBI or DEA interview. If one took the Authority's logic for all it portended, the Justice Department would have committed an unfair labor practice if Wood had been called before a grand jury and the Assistant United States Attorney refused to permit his union representative to sit at his side.
 
 
 23
 In addition to its incongruity with the language of section 7114(a)(2)(B), the Authority's interpretation clashes with the Inspector General Act of 1978, 5 U.S.C. app. Secs. 1-12. Here we follow the lead of the Fourth Circuit in United States Nuclear Regulatory Comm'n v. FLRA, 25 F.3d 229 (4th Cir.1994). Writing for the court, Judge Niemeyer held that the federal labor relations Statute did not compel the Nuclear Regulatory Commission to negotiate with a union about the procedures the Commission's Inspector General must follow during investigatory interviews of Commission union members.
 
 
 24
 The Inspector General Act established within the Department of Justice, as within other specified agencies, an "independent and objective unit" to conduct audits and civil and criminal investigations relating to the Department's operations. 5 U.S.C.App. Sec. 4(a)(1). Many of the Act's provisions are aimed at maintaining each Inspector General's independence from the agency he audits and investigates. We cannot improve upon Judge Niemeyer's careful summary of these provisions: "Thus, Inspectors General are appointed by the President and confirmed by the Senate, 'without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations.' [5 U.S.C.App. Sec. 3(a) ]. Moreover, only the President, and not the agency head, may remove an Inspector General, and even then the President must provide Congress with his reasons for doing so. [5 U.S.C. app. Sec. 3(b) ]. Inspectors General are required to prepare semi-annual reports to Congress on the results of their investigations, and, even though an agency head may add comments on a report, he or she generally cannot prevent the report from going to Congress or change its contents. [5 U.S.C. app. Sec. 5(b)(1) ] ... Inspectors General are required to notify the Attorney General directly, without notice to other agency officials, upon discovery of 'reasonable grounds to believe there has been a violation of Federal criminal law.' [5 U.S.C. app. Sec. 4(d) ]. Inspectors General are also granted the power to select and employ whatever personnel are necessary to conduct their affairs, to employ experts and consultants, and to enter into contracts for audits, studies and other necessary services. [5 U.S.C. app. Secs. 6(a), 7-9]. Even though Inspectors General are under the 'general supervision' of the agency head and one deputy, neither may 'prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation,' [5 U.S.C. app. Sec. 3(a) ], nor may they transfer 'program operating responsibilities' to the Inspector General. [5 U.S.C. app. Sec. 9(a) ]. Most importantly, apart from the limited supervision of the top two agency heads, no one else in the agency may provide any supervision to Inspectors General: the Act provides that the Inspector General 'shall not report to, or be subject to supervision by, any other officer of [the agency].' [5 U.S.C. app. Sec. 3(a) ].
 
 
 25
 "Thus, shielded with independence from agency interference, the Inspector General in each agency is entrusted with the responsibility of auditing and investigating the agency, a function which may be exercised in the judgment of the Inspector General as each deems it 'necessary or desirable.' [5 U.S.C. app. Sec. 6(a)(2) ]. To facilitate that function, the Act gives to each Inspector General access to the agency's documents and agency personnel. The Inspector General may issue subpoenas, administer oaths, and investigate complaints and information from any employee of the agency 'concerning the possible existence of an activity constituting a violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority or a substantial and specific danger to the public health and safety.' [5 U.S.C. app. Sec. 7(a).]" United States Nuclear Regulatory Comm'n, 25 F.3d at 233-34.
 
 
 26
 Given these provisions, none of which the Authority or the Third Circuit in Defense Criminal Investigative Services mentioned, there cannot be the slightest doubt that Congress gave the Inspector General the independent authority to decide "when and how" to investigate (United States Nuclear Regulatory Comm'n, 25 F.3d at 234); that the Inspector General's authority encompasses determining how to conduct interviews under oath; and that the Inspector General's independence and authority would necessarily be compromised if another agency of government--the Federal Labor Relations Authority--influenced the Inspector General's performance of his duties on the basis of its view of what constitutes an unfair labor practice.
 
 
 27
 We have noticed before that section 7114(a)(2)(B) conferred on federal employees rights similar to those established for private employees in decisions of the National Labor Relations Board. See National Treasury Employees Union v. FLRA, 835 F.2d 1446, 1450 (D.C.Cir.1987). The Supreme Court sustained the Board in NLRB v. J. Weingarten, Inc., 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), and it may be supposed that Weingarten bears on our analysis of section 7114(a)(2)(B), even though the statute ultimately controls. National Treasury Employees Union v. FLRA, 835 F.2d at 1451. The ALJ in this case devoted considerable attention to Weingarten, but only in regard to issues concerning the prerogatives of union representatives during investigatory interviews. Those issues are not presented unless the Inspector General's investigator, in the words of section 7114(a)(2)(B), was acting as "a representative of the agency [containing the bargaining unit] in connection with an investigation" when he conducted the examination. As we have said, in light of the language of section 7114(a)(2)(B) and the autonomy of the Office of Inspector General, the Inspector General's investigator does not fit that statutory description. We detect nothing in Weingarten to alter this conclusion.
 
 
 28
 The Supreme Court in Weingarten, and the National Labor Relations Board, viewed the matter in terms of "bargaining power." The presence of a union representative during the interview would, the Court said, ameliorate the inequality of bargaining power between an employee going it alone and his employer. Weingarten, 420 U.S. at 262, 95 S.Ct. at 966. Good faith discussions between the parties might avert grievances, solve problems early and prevent hard feelings between labor and management. 420 U.S. at 262-63 & nn.7-8, 95 S.Ct. at 966-67 & nn. 7-8. These considerations do not apply to examinations of employees under oath in the course of an Inspector General's investigation. It is not part of the Inspector General's responsibilities to engage in negotiations with a union in order to avoid labor-management disputes within the employing agency. The Inspector General does not stand in the shoes of management. To perform his duties independently and objectively, the Inspector General cannot side with management, or the union. His mission is to uncover "violation[s] of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority or a substantial and specific danger to the public health and safety" (5 U.S.C. app. Sec. 7(a)) within the agencies of his department. Management officials (see 5 U.S.C. Sec. 7103(a)(11)), as well as unionized employees, may be the targets of an Inspector General's investigation. See also S.Rep. No. 1071, 95th Cong., 2d Sess. 27 (1978), reprinted in 1978 U.S.C.C.A.N. 2676, 2702-03. Of course, representation might assist union members. But that is not because of anything having to do with labor-management relations or collective bargaining. Anyone--whether a union member, a management official or an individual not employed by the federal government--would be prudent to secure legal representation if they are to be questioned under oath.[10]
 
 
 29
 Rooted as it necessarily is in labor-management relations, Weingarten cannot alter the conclusion, evident from section 7114(a)(2)(B) and the Inspector General Act, that the Authority erred in considering the Office of Inspector General to be the "agency" subject to that provision. Because section 7114(a)(2)(B) did not govern the investigatory interview of union member Wood, neither the Office of Inspector General nor OPR committed unfair labor practices when the investigator restricted the role of Wood's union representative.
 
 III
 
 30
 Much of what we have already written disposes of the next question--whether investigator Nelson's questioning of Gillies and Wood about their conversations constituted unfair labor practices.
 
 
 31
 The ALJ held that the investigator had infringed upon the employee-union representative "privilege" established in United States Department of Treasury Customs Service, Washington, D.C., 38 F.L.R.A. 1300 (1991). Quoting the ALJ, the Authority in Customs Service viewed the issue as "whether the designated union representative of an employee in an actual or potential disciplinary action can be examined by management concerning statements made by the employee to his, or her, representative." 38 F.L.R.A. at 1302. There is, the Authority answered, a "privilege" protecting "the content or substance of statements made by an employee to [his] Union representative in the course of representing the employee in a disciplinary proceeding." 38 F.L.R.A. at 1308.[11] Because section 7114(a) "assures the right and duty of a union to represent employees in disciplinary proceedings," an employee must "be free to make full and frank disclosure to his or her representative in order that the employee have adequate advice and a proper defense." Id.
 
 
 32
 We do not question this reasoning insofar as it applies to management. But the Office of Inspector General is not within that category. The Inspector General operates independently, his investigatory procedures are not a proper subject of collective bargaining, and he does not act on behalf of the employing agency. The privilege the Authority recognizes, derived from the section 7114(a) right of an employee to union representation in an investigation, may be good as against management. But it is not good as against the world. The Authority's jurisdiction is limited to labor-management relations. As its counsel agreed at oral argument, whatever privilege the Authority set up in that context would not shield a conversation between an employee and his union representative from disclosure in court, or before a grand jury.[12] If an FBI or a DEA agent, or a federal prosecutor--all Department of Justice employees--pressured a union official to reveal such a conversation, this would not constitute an unfair labor practice for the quite apparent reason that section 7114(a) does not apply. So too with the Office of Inspector General, as Congress has created it.
 
 IV
 
 33
 The last issue deals with the union's three document requests, made to the Immigration and Naturalization Service in November and December 1990 on Wood's behalf while disciplinary proceedings were pending against him. The union sought production of five categories of information "[i]n order to properly respond to the allegations set forth in the notice" of proposed removal.[13] The Authority sustained, with some modifications, the ALJ's determination that the Service committed unfair labor practices by failing to provide the information to the union. Given the state of the record and the possibility that our decision of the other issues may affect this aspect of the case, we vacate the order against the Service and remand for further proceedings.
 
 
 34
 Unions are entitled to receive from the agency information that is "reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining," and "which does not constitute guidance, advice, counsel, or training provided for management officials or supervisors, relating to collective bargaining...." 5 U.S.C. Sec. 7114(b)(4)(B) & (C). After the union forwarded its requests in this case, and only a few days before the ALJ rendered his ruling, we released our decision in NLRB v. FLRA, 952 F.2d 523 (D.C.Cir.1992), interpreting section 7114(b)(4). We held that unions are entitled to "necessary" information, that information is not "necessary" merely because it is relevant, and that "the requisite strength of the union's 'need' will depend on the intensity of countervailing interests." 952 F.2d at 531. While in this case the Authority acknowledged our NLRB v. FLRA decision and, without saying whether it applied, indicated that the union had satisfied it in any event, none of the parties appears to have framed the case in the terms of our decision. We see in the record no explanation on behalf of the union regarding the "necessity" of its receiving each of the requested items, as NLRB v. FLRA interpreted the term, and we find nothing on behalf of the Service explaining what "countervailing interests" it had in refusing to disclose any of them. Furthermore, much of the information requested relates to the functioning of the Office of Inspector General. Our ruling that the Inspector General's investigator was not serving as an agency representative under section 7114(a)(2)(B) may affect not only the relevance of such information but also the union's need for it and the Service's reasons for not supplying it. We therefore believe the proper disposition is to follow Department of the Air Force, Scott Air Force Base v. FLRA, 956 F.2d 1223 (D.C.Cir.1992) (per curiam), by remanding this aspect of the case to the Authority so that it may analyze anew the union's document request under the principles of NLRB v. FLRA. It is up to the Authority to decide whether the parties may supplement the record in light of that decision and what we said here.
 
 
 35
 The joint petition for review is granted, the Authority's orders are vacated and the case is remanded for further proceedings.
 
 
 
 [1]
 In the beginning of the interview, Nelson identified himself to Wood and the union representative as an officer of the "Immigration and Naturalization Service ... representing the Regional Commissioner." The ALJ found, however, that Nelson was working exclusively for the Office of Inspector General; that the Service could not "control his investigation in any way"; and that Wood, as a result of his conversation with Gillies before the interview, knew that Nelson was acting as an investigator for the Inspector General. The parties make nothing of Nelson's contrary statement at the beginning of the interview and neither shall we. We therefore do not treat Nelson's warnings to Gillies and Wood--that the Service "might" discipline them if they refused to answer--as having been made on behalf of the Service or pursuant to the Service's directions
 
 
 [2]
 The ALJ, and thus the Authority, also ruled that the Inspector General (and OPR) committed a separate violation of Sec. 7114(a)(2)(B) because Nelson generally "interfered with the Union representative's ability to take an active part in assisting the employee to elicit and present facts as contemplated by the Statute." Although it is of no moment in light of our resolution of the case, the record does not support this ruling. Apart from having private conferences with Wood, there was nothing else union representative Hagen wanted to do in representing Wood during the interview that Nelson prevented him from doing. Hagen so admitted. When asked during the unfair labor practice proceedings if "there [was] anything else, other than conferring privately with [Border Patrol Agent] Wood that you wanted to do or planned on doing that you couldn't do," Hagen answered "No."
 
 
 [3]
 The Office of Inspector General and OPR objected to the ALJ's decision on the ground that Nelson was not acting as a "representative of the agency under section 7114(a)(2)(B)."
 
 
 [4]
 To simplify, we put aside the unfair labor practice charge against the Office of Professional Responsibility. It rests entirely on the actions of the Inspector General, has no independent significance and does not affect our analysis
 
 
 [5]
 The Statute forbids the formation of bargaining units containing employees primarily engaged in investigating other agency employees to ensure they are acting honestly--an apt description of investigators working for the Inspector General. See United States Nuclear Regulatory Comm'n v. FLRA, 25 F.3d 229, 235 (4th Cir.1994) (citing 5 U.S.C. Sec. 7112(b)(7)); Small Business Admin. & Am. Fed. of Gov't Employees Local 2532 & Council 228, AFL-CIO, 34 F.L.R.A. 392 (1990)
 
 
 [6]
 The Third Circuit reasoned as follows: "[T]he degree of supervision exercised by the [Defense Department] management over the affairs of the [Inspector General] is simply irrelevant. [Inspector General] investigators are employees of the [Defense Department] and their purpose when conducting interviews like the ones here involved is to solicit information concerning possible misconduct of [Defense Department] employees in connection with their work. Concededly, the information secured may be disseminated to supervisors in affected subdivisions of the [Defense Department] to be utilized by those supervisors for [Defense Department] purposes. Under these circumstances, we are confident that Congress would regard a[n] [Inspector General] investigator as a 'representative' of the [Defense Department]." Defense Criminal Investigative Services, 855 F.2d at 100
 
 
 [7]
 However, the independence of the Office of Inspector General, which we later discuss, might make it difficult to attribute its investigatory actions to the Justice Department under section 7114(a)(2)(B)
 
 
 [8]
 "[T]he [Inspector General] Act gives the Inspectors General both civil and criminal investigative authority and subpoena powers coextensive with that authority." United States v. Aero Mayflower Transit Co., 831 F.2d 1142, 1145 (D.C.Cir.1987) (footnotes omitted)
 
 
 [9]
 We know the Statute excludes the FBI from its definition of "agency" under Sec. 7103(a)(3)(B). And we also know that an Executive order, issued pursuant to Sec. 7103(b)(1), exempts the Office of Enforcement and the Office of Intelligence of the DEA from coverage. See Exec. Order No. 12,632, Sec. 1-209(a), 53 Fed.Reg. 9852 (1988), reprinted in 5 U.S.C. Sec. 7103. Our point in the text, which deals with the effect of treating the Department of Justice as the "agency" for purposes of Sec. 7114(a)(2)(B), remains. See also note 5 supra
 
 
 [10]
 The Administrative Procedure Act, 5 U.S.C. Sec. 555(b), provides that anyone "compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel...." See Professional Reactor Operator Soc'y v. United States Nuclear Regulatory Comm'n, 939 F.2d 1047 (D.C.Cir.1991); SEC v. Csapo, 533 F.2d 7 (D.C.Cir.1976)
 
 
 [11]
 The Authority relied on Cook Paint & Varnish Co., 258 N.L.R.B. 1230 (1981), on remand from Cook Paint & Varnish Co. v. NLRB, 648 F.2d 712, 725 (D.C.Cir.1981)
 
 
 [12]
 Our analysis does not turn on the fact, stressed by the Office of Inspector General and OPR in their brief, that when investigator Nelson questioned Gillies, Nelson was in the midst of a criminal investigation, sanctioned by the Assistant United States Attorney. We also do not reach the argument of the Office of Inspector General and OPR that Wood's failure to invoke the privilege in response to Nelson's questions precluded any finding of an unfair labor practice. Cf. Garrity v. New Jersey, 385 U.S. 493, 497-98, 87 S.Ct. 616, 618-19, 17 L.Ed.2d 562 (1967)
 
 
 [13]
 The union requested the following materials: (1) proposed and final decisions involving adverse and disciplinary actions in the Northern Region of the Service from January 1, 1985, to November 1990, for "offenses similar to those alleged against" Wood; (2) the Inspector General's report mentioned in the notice of proposed removal and the accompanying exhibits; (3) the statutory and regulatory authority supporting the Inspector General's investigation of Wood; (4) any agreements between the Service and the Office of Inspector General relating to such investigations; and (5) "all [Service] internal guidelines, instructions, and standard operating procedure manual for Office of Inspector General Investigators regarding investigations of [Service] Employees."
 The Service produced Nelson's August 28, 1990, Report of Investigation--all the Office of Inspector General had supplied to it--but none of the exhibits to the Report and none of the other information the union sought. (The ALJ found that the Inspector General does not release its files to anyone outside of the Office of Inspector General and OPR, but may disclose exhibits it deems "relevant" if an agency so requests.)