Justice Stevens
delivered the opinion of the Court.
On October 12, 1978, Congress enacted the Inspector General Act (IGA), 5 U. S. C. App. § 1 et seq., p. 1381, which created an Office of Inspector General (OIG) in each of several federal agencies, including the National Aeronautics and Space Administration (NASA). The following day, Congress enacted the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U. S. C. § 7101 et seq., which provides certain protections, including union representation, to a variety of federal employees. The question presented by this case is whether an investigator employed in NASA’s Office of Inspector General (NASA-OIG) can be considered a “representative” of NASA when examining a NASA employee, such that the right to union representation in the FSLMRS may be invoked. § 7114(a)(2)(B). Although certain arguments of policy may support a negative answer to that question, the plain text of the two statutes, buttressed by administrative deference and Congress’ countervailing policy concerns, dictates an affirmative answer.
I
In January 1993, in response to information supplied by the Federal Bureau of Investigation (FBI), NASA’s OIG con *232 ducted an investigation of certain threatening activities of an employee of the George C. Marshall Space Flight Center in Huntsville, Alabama, which is also a component of NASA. A NASA-OIG investigator contacted the employee to arrange for an interview and, in response to the employee’s request, agreed that both the employee’s lawyer and union representative could attend. The conduct of the interview gave rise to a complaint by the union representative that the investigator had improperly limited his participation. The union filed a charge with the Federal Labor Relations Authority (Authority) alleging that NASA and its OIG had committed an unfair labor practice. See §§ 7116(a)(1), (8).
The Administrative Law Judge (AU) ruled for the union with respect to its complaint against NASA-OIG. See App. to Pet. for Cert. 71a. The ALJ concluded that the OIG investigator was a “representative” of NASA within the meaning of §7114(a)(2)(B), and that certain aspects of the investigator’s behavior had violated the right to union representation under that section. Id., at 64a-65a, 69a-70a. On review, the Authority agreed that the NASA-OIG investigator prevented the union representative from actively participating in the examination and (1) ordered both NASA and NASA-OIG to cease and desist (a) requiring bargaining unit employees to participate in OIG interviews under § 7114(a)(2)(B) without allowing active participation of a union representative, and (b) likewise interfering with, coercing, or restraining employees in exercising their rights under the statute; and (2) directed NASA to (a) order NASA-OIG to comply with § 7114(a)(2)(B), and (b) post appropriate notices at the Huntsville facility. NASA, 50 F. L. R. A. 601, 602, 609, 622-628 (1995).
NASA and NASA-OIG petitioned for review, asking whether the NASA-OIG investigator was a “representative” of NASA, and whether it was proper to grant relief against NASA as well as its OIG. The Court of Appeals upheld the Authority’s rulings on both questions and granted the *233 Authority’s application for enforcement of its order. 120 F. 3d 1208, 1215-1217 (CA11 1997). Because of disagreement among the Circuit Courts over the applicability of § 7114(a)(2)(B) in such circumstances, see FLRA v. United States Dept. of Justice, 137 F. 3d 683 (CA2 1997); United States Dept. of Justice v. FLRA, 39 F. 3d 361 (CADC 1994); Defense Criminal Investigative Serv. v. FLRA, 855 F. 2d 93 (CA3 1988), we granted certiorari. 525 U. S. 960 (1998).
HH 1 — 1
The FSLMRS provides, in relevant part,
“(2) An exclusive representative of an appropriate unit in an agency shall be given the opportunity to be represented at—
“(B) any examination of an employee in the unit by a representative of the agency in connection with an investigation if—
“(i) the employee reasonably believes that the examination may result in disciplinary action against the employee; and
“(ii) the employee requests representation.” 5 U.S.C. § 7114(a).
In this ease it is undisputed that the employee reasonably believed the investigation could result in discipline against him, that he requested union representation, that NASA is the relevant “agency,” and that, if the provision applies, a violation of § 7114(a)(2)(B) occurred. The contested issue is whether a NASA-OIG investigator can be considered a “representative” of NASA when conducting an employee examination covered by § 7114(a)(2)(B).
NASA and its OIG argue that, when § 7114(a)(2)(B) is read in context and compared with the similar right to union representation protected in the private sector by the National Labor Relations Act (NLRA), the term “representative” *234 refers only to a representative of agency management— “i. e., the entity that has a collective bargaining relationship with the employee’s union.” Brief for Petitioners 13. Neither NASA nor NASA-OIG has such a relationship with the employee’s union at the Huntsville facility, see 5 U. S. C. § 7112(b)(7) (excluding certain agency investigators and auditors from “appropriate” bargaining units), and so the investigator in this ease could not have been a “representative” of the relevant “entity.”
By its terms, § 7114(a)(2)(B) is not limited to investigations conducted by certain “entities]” within the agency in question. It simply refers to representatives of “the agency,” which, all agree, means NASA. Cf. § 7114(a)(2) (referring to employees “in the unit” and an exclusive representative “of an appropriate unit in an agency”). Thus, relying on prior rulings, the Authority found no basis in the FSLMRS or its legislative history to support the limited reading advocated by NASA and its OIG. The Authority reasoned that adopting their proposal might erode the right by encouraging the use of investigative conduits outside the employee’s bargaining unit, and would otherwise frustrate Congress’ apparent policy of protecting certain federal employees when they are examined and justifiably fear disciplinary action. 50 F. L. R. A., at 615, and n. 12. That is, the risk to the employee is not necessarily related to which component of an agency conducts the examination. See App. to Pet. for Cert. 65a (information obtained by NASA-OIG is referred to agency officials for administrative or disciplinary action).
In resolving this issue, the Authority was interpreting the statute Congress directed it to implement and administer. 5 U. S. C. §7105. The Authority’s conclusion is certainly consistent with the FSLMRS and, to the extent the statute and congressional intent are unclear, we may rely on the Authority’s reasonable judgment. See Federal Employees v. Department of Interior, 526 U. S. 86, 98-100 (1999); Fort Stewart Schools v. FLRA, 495 U. S. 641, 644-645 (1990).
*235 Despite the text of the statute and the Authority’s views, NASA and NASA-OIG advance three reasons for their narrow reading. First, the language at issue is contained in a larger section addressing rights and duties related to collective bargaining; indeed, 5 U. S. C. § 7114 is entitled “Representation rights and duties.” Thus, other subsections define the union’s right to exclusive representation of employees in the bargaining unit, § 7114(a)(1); its right to participate in grievance proceedings, § 7114(a)(2)(A); and its right and duty to engage in good-faith collective bargaining with the agency, §§ 7114(a)(4), (b). That context helps explain why the right granted in § 7114(a)(2)(B) is limited to situations in which the employee “reasonably believes that the examination may result in disciplinary action” — a condition restricting the right to union presence or participation in investigatory examinations that do not threaten the witness’ employment. We find nothing in this context, however, suggesting that an examination that obviously presents the risk of employee discipline is nevertheless outside the coverage of the section because it is conducted by an investigator housed in one office of NASA rather than another. On this point, NASA’s internal organization is irrelevant.
Second, the phrase “representative of the agency” is used in two other places in the FSLMRS where it may refer to representatives of agency management acting in their capacity as actual or prospective parties to a collective-bargaining agreement. One reference pertains to grievances, § 7114(a)(2)(A), and the other to the bargaining process itself, §7103(a)(12) (defining “collective bargaining”). NASA and NASA-OIG submit that the phrase at issue should ordinarily retain the same meaning wherever used in the same statute, and we agree. But even accepting NASA’s and NASA-OIG’s characterization of §§ 7114(a)(2)(A) and 7103(a)(12), the fact that some “representative^] of the^ agency” may perform functions relating to grievances and bargaining does not mean that other personnel who conduct *236 examinations covered by § 7114(a)(2)(B) are not also fairly characterized as agency “representative^].” As an organization, an agency must rely on a variety of representatives to carry out its functions and, though acting in different capacities, each may be acting for, and on behalf of, the agency.
Third, NASA and NASA-OIG assert that their narrow construction is supported by the history and purpose of § 7114(a)(2)(B). As is evident from statements by the author of the provision[1] as well as similar text in NLRB v. J. Weingarten, Inc., 420 U. S. 251 (1975), this section of the FSLMRS was patterned after that decision. In Weingarten, we upheld the National Labor Relations Board’s conclusion that an employer’s denial of an. employee’s request to have a union representative present at an investigatory interview, which the employee reasonably believed might result in disciplinary action, was an unfair labor practice. Id., at 252-253, 256. We reasoned that the Board’s position was consistent with the employee’s right under § 7 of the NLRA to engage in concerted activities. Id., at 260. Given that history, NASA and its OIG contend that the comparable provision in the FSLMRS should be limited to investigations by representatives of that part of agency management with responsibility for collectively bargaining with the employee’s union.
This argument ignores the important difference between the text of the NLRA and the text of the FSLMRS. That the general protection afforded to employees by §7 of the NLRA provided a sufficient basis for the Board’s recognition of a novel right in the private sector, see id., at 260-262, *237 266-267, does not justify the conclusion that the text of the FSLMRS — which expressly grants a comparable right to employees in the public sector — should be narrowly construed to cover some, but not all, interviews conducted by agency representatives that have a disciplinary potential. Congress’ specific endorsement of a Government employee’s right to union representation by incorporating it in the text of the FSLMRS gives that right a different foundation than if it were merely the product of an agency’s attempt to elaborate on a more general provision in light of broad statutory purposes.[2] The basis for the right to union representation in this context cannot compel the uneodified limitation proposed by NASA and its OIG.
Employing ordinary tools of statutory construction, in combination with the Authority’s position on the matter, we have no difficulty concluding that § 7114(a)(2)(B) is not limited to agency investigators representing an “entity” that collectively bargains with the employee’s union.
III
Much of the disagreement in this ease involves the interplay between the FSLMRS and the IGA. On NASA’s and NASA-OIG’s view, a proper understanding of the IGA precludes treating OIG personnel as “representative^]” of the agencies they are duty-bound to audit and investigate. They add that the Authority has no congressional mandate or expertise with respect to the IGA, and thus we owe the Authority no deference on this score. It is unnecessary for us to defer, however, because a careful review of the relevant IGA provisions plainly favors the Authority’s position.
*238 Section 2 of the IGA explains the purpose of the Act and establishes “an office of Inspector General” in each of a list of identified federal agencies, thereby consolidating audit and investigation responsibilities into one agency component. It provides:
“In order to ereate independent and objective units— “(1) to conduct and supervise audits and investigations relating to the programs and operations of the establishments listed in section 11(2);
“(2) to provide leadership and coordination and recommend policies for activities designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in, such programs and operations; and
“(3) to provide a means for keeping the head of the establishment and the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations and the necessity for and progress of corrective action;
“there is hereby established in each of such establishments an office of Inspector General.” 5 U. S. C. App. §2, p. 1381.
NASA is one of more than 20 “establishment[s]” now listed in § 11(2).[3]
Section 3 of the IGA provides that each of the offices created by §2 shall be headed by an Inspector General appointed by the President, and confirmed by the Senate, “without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public adminis *239 tration, or investigations.” §3(a). Each of these Inspectors General “shall report to and be under the general supervision of the head of the establishment involved or, to the extent such authority is delegated, the officer next in rank below such head,” but shall not be subject to supervision by any lesser officer. Ibid. Moreover, an Inspector General’s seniors within the agency may not “prevent or prohibit” the Inspector General from initiating or conducting any audit or investigation. Ibid.; see also § 6(a)(2). The President retains the power to remove an Inspector General from office. §3(b).
Section 4 contains a detailed description of the duties of each Inspector General with respect to the agency “within which his Office is established.” §4(a). Those duties include conducting audits and investigations, recommending new policies, reviewing legislation, and keeping the head of the agency and the Congress “fully and currently informed” through such means as detailed, semiannual reports. §§4(a)(1)-(5). Pursuant to §5, those reports must be furnished to the head of the agency, who, in turn, must forward them to the appropriate committee or subcommittee of Congress with such comment as the agency head deems appropriate. § 5(b)(1); see also §5(d). Section 6 grants the Inspectors General specific authority in a variety of areas to facilitate the mission of their offices. Accordingly, Inspectors General possess discretion to conduct investigations “relating to the administration of the programs and operations of the applicable” agency, § 6(a)(2); the ability to request information and assistance from Government agencies, § 6(a)(3); access to the head of the agency, § 6(a)(6); and the power to hire employees, enter into contracts, and spend congressionally appropriated funds, §§ 6(a)(7), (9); see also §3(d). Finally, §9(a)(1)(P) provides for the transfer of the functions previously performed by NASA’s ‘“Management Audit Office’ and the ‘Office of Inspections and Security”’ to NASA-OIG.
*240 The IGA created no central office or officer to supervise, direct, or coordinate the work of all OIG’s and their respective staffs. Other than congressional committees (which are the recipients of the reports prepared by each Inspector General) and the President (who has the power to remove an Inspector General), each Inspector General has no supervising authority — except the head of the agency of which the OIG is a part. There is no “OIG-OIG.” Thus, for example, NASA-OIG maintains an office at NASA’s Huntsville facility, which reports to NASA-OIG in Washington, and then to the NASA Administrator, who is the head of the agency. § 11(1); 50 F. L. R. A., at 602.[4] In conducting their work, Congress certainly intended that the various OIG’s would enjoy a great deal of autonomy. But unlike the jurisdiction of many law enforcement agencies, an OIG’s investigative office, as contemplated by the IGA, is performed with regard to, and on behalf of, the particular agency in which it is stationed. See 5 U. S. C. App. §§2, 4(a), 6(a)(2). In common parlance, the investigators employed in NASA’s OIG are unquestionably “representatives” of NASA when acting within the scope of their employment.
Minimizing the significance of this statutory plan, NASA and NASA-OIG emphasize the potentially divergent interests of the OIG’s and their parent agencies. To be sure, OIG’s maintain authority to initiate and conduct investigations and audits without interference from the head of the agency. §3(a). And the ability to proceed without consent from agency higher-ups is vital to effectuating Congress’ intent and maintaining an opportunity for objective inquiries into bureaucratic waste, fraud, abuse, and mismanagement.[5] *241 But those characteristics do not make NASA-OIG any less a representative of NASA when it investigates a NASA employee. That certain officials within an agency, based on their views of the agency’s best interests or their own, might oppose an OIG investigation does not tell us whether the investigators are “representatives” of the agency during the course of their duties. As far as the IGA is concerned, NASA-OIG’s investigators are employed by, act on behalf of, and operate for the benefit of NASA.
Furthermore, NASA and NASA-OIG overstate the inherent conflict between an OIG and its agency. The investigation in this ease was initiated by NASA’s OIG on the basis of information provided by the FBI, but nothing in the IGA indicates that, if the information had been supplied by the Administrator of NASA rather than the FBI, NASA-OIG would have had any lesser obligation to pursue an investigation. See §§ 4(a)(1), (d), 7; S. Rep. No. 95-1071, p. 26 (1978). The statute does not suggest that one can determine whether the OIG personnel engaged in such an investigation are “representatives” of NASA based on the source of the information prompting an investigation. Therefore, it must be NASA’s and NASA-OIG’s position that even when an OIG conducts an investigation in response to a specific request from the head of an agency, an employee engaged in that assignment is not a “representative” of the agency within the meaning of § 7114(a)(2)(B) of the FSLMRS. Sueh management-prompted investigations are not rare.[6]
*242 Thus, not all OIG examinations subject to § 7114(a)(2)(B) will implicate an actual or apparent conflict of interest with the rest of the agency; and in many cases we can expect honest cooperation between an OIG and management-level agency personnel. That conclusion becomes more obvious when the practical operation of OIG interviews and § 7114(a)(2)(B) rights are considered. The IGA grants Inspectors General the authority to subpoena documents and information, but not witnesses. 5 U. S. C. App. § 6(a)(4). Nor does the IGA allow an OIG to discipline an agency employee, as all parties to this case agree. There may be other incentives for employee cooperation with OIG investigations, but formal sanctions for refusing to submit to an OIG interview cannot be pursued by the OIG alone. Such limitations on OIG authority enhance the likelihood and importance of cooperation between the agency and its OIG. See generally §§ 6(a)(3), (b)(1)-(2) (addressing an Inspector General’s authority to request assistance from others in the agency, and their duty to respond); §§ 4(a)(5), (d); 50 F. L. R. A., at 616; App. to Pet. for Cert. 65a (noting information sharing between NASA-OIG and other agency officials). Thus, if the NASA-OIG investigator in this case told the employee that he would face dismissal if he refused to answer questions, 120 F. 3d, at 1210, n. 2, the investigator invoked NASA’s authority, not his own.[7]
*243 Considering NASA-OIG’s statutorily defined role within the agency, we cannot conclude that the proper operation of the IGA requires nullification of § 7114(a)(2)(B) in all OIG examinations.
IV
Although NASA’s and NASA-OIG’s narrow reading of the phrase “representative of the agency” is supported by the text of neither the FSLMRS nor the IGA, they also present broader — but ultimately unpersuasive — arguments of policy to defeat the application of § 7114(a)(2)(B) to OIG investigations.
First, NASA and NASA-OIG contend that enforcing § 7114(a)(2)(B) in situations similar to this case would undermine NASA-OIG’s ability to maintain the confidentiality of investigations, particularly those investigations conducted jointly with law enforcement agéncies. Cf. 5 U. S. C. App. §§ 5(e)(1)(C), (e)(2) (restricting OIG disclosure of information that is part of an ongoing criminal investigation). NASA and its OIG are no doubt correct in suggesting that the presence of a union representative at an examination will increase the likelihood that its contents will be disclosed to third parties. That possibility is, however, always present: NASA and NASA-OIG identify no legal authority restricting an employee’s ability to discuss the matter with others. Furthermore, an employee cannot demand the attendance of a union representative when an OIG examination does not involve reasonably apparent potential discipline for that employee. Interviewing an employee who may have information relating to agency maladministration, but who is not himself under suspicion, ordinarily will not trigger the right to union representation. Thus, a variety of OIG investigations and interviews — and many in which confidentiality concerns are heightened — will not implicate § 7114(a)(2)(B) at all. Though legitimate, NASA’s and NASA-OIG’s confidentiality concerns are not weighty enough to justify a *244 nontextual construction of § 7114(a)(2)(B) rejected by the Authority.
Second, NASA and its OIG submit that, in other instances, the Authority has construed § 7114(a)(2)(B) so broadly that it will impair NASA-OIG’s ability to perform its investigatory responsibilities. The Authority responds that it has been sensitive to agencies’ investigative needs in other cases, and that union representation is unrelated to OIG independence from agency interference. Whatever the propriety of the Authority’s rulings in other cases, NASA and NASA-OIG elected not to challenge the Authority’s conclusion that the NASA-OIG examiner’s attempt to limit union representative participation constituted an unfair labor practice. To resolve the question presented in this case, we need not agree or disagree with the Authority’s various rulings regarding the scope of § 7114(a)(2)(B), nor must we consider whether the outer limits of the Authority’s interpretation so obstruct the performance of an OIG’s statutory responsibilities that the right must be more confined in this context.[8]
In any event, the right Congress created in § 7114(a)(2)(B) vindicates obvious countervailing federal policies. It provides a procedural safeguard for employees who are under investigation by their agency, and the mere existence of the right can only strengthen the morale of the federal work force. The interest in fair treatment for employees under *245 investigation is equally strong whether they are being questioned by employees in NASA’s OIG or by other representatives of the agency. And, as we indicated in Weingarten, representation is not the equivalent of obstruction. See 420 U. S., at 262-264. In many cases the participation of a union representative will facilitate the factfinding process, and a fair resolution of an agency investigation — or at least Congress must have thought so.
Whenever a procedural protection plays a meaningful role in an investigation, it may impose some burden on the investigators or agency managers in pursuing their mission. We must presume, however, that Congress took account of the policy concerns on both sides of the balance when it decided to enact the IGA and, on the heels of that statute, § 7114(a)(2)(B).[9]
*246 V
Finally, NASA argues that it was error for the Authority to make NASA itself, as well as NASA’s OIG, a party to the enforcement order because NASA has no authority over the manner in which NASA-OIG conducts its investigations. However, our conclusion that the investigator in this case was acting as a “representative” of NASA for purposes of § 7114(a)(2)(B) makes it appropriate to charge NASA-OIG, as well as the parent agency to which it reports and for which it acts, with responsibility for ensuring that such investigations are conducted in compliance with the FSLMRS. NASA’s Administrator retains general supervisory authority over NASA’s OIG, 5 U. S. C. App. § 8(a), and the remedy imposed by the Authority does not require NASA to interfere unduly with OIG prerogatives. NASA and NASA-OIG offer no convincing reason to believe that the Authority’s remedy is inappropriate in view of the IGA, or that it will be ineffective in protecting the limited right of union representation secured by § 7114(a)(2)(B). See generally 5 U. S. C. §§706, 7123(c).
The judgment of the Court of Appeals is

Affirmed.

 Congressman Udall, whose substitute contained the section at issue, explained that the “provisions concerning investigatory interviews reflect the ... holding in” Weingarten. 124 Cong. Rec. 29184 (1978); Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978 (Committee Print compiled for the House Subcommittee on Postal Personnel and Modernization of the Committee on Post Office and Civil Service), Ser. No. 96-7, p. 926 (1979) (hereinafter FSLMRS Leg. Hist.); see NASA, 50 F. L. R. A. 601, 606 (1995).

 See id., at 608, n. 5 (Congress recognized that the right to union representation might evolve differently in the federal and private sectors); H. R. Conf. Rep. No. 95-1717, p. 156 (1978), FSLMRS Leg. Hist. 824; cf. Karahalios v. Federal Employees, 489 U. S. 527, 534 (1989) (the FSLMRS "is not a carbon copy of the NLRA”).

 Such establishments are described as “agencies” in other federal legislation, such as the FSLMRS. See 5 U. S. C. §§ 101-105, 7108(a)(3). Note also that other OIG’s were created by subsequent amendments to the IGA and may be structured differently than those OIGs, such as NASA’s, discussed in the text. See, e. g., 5 U. S. C. App. §§8, 8E, 8G.

 At oral argument, NASA and NASA-OIG indicated that the Administrator’s general supervision authority includes the ability to require its Inspector General to comply with, inter alia, equal employment opportunity regulations. Tr. of Oral Arg. 5.

 See §2; S. Rep. No. 95-1071, pp. 1,5-7,9 (1978); H. R. Rep. No. 95-584, pp. 2, 5-6 (1977).

 See, e.g., United States INS, 46 F. L. R. A. 1210, 1226-1231 (1993), review den. sub nom. American Federation of Govt. Employees, AFL-CIO, Local 1917 v. FLRA, 22 F. 3d 1184 (CADG 1994); United States Dept. of Justice, INS, 46 F. L. R. A. 1526, 1549 (1993), review granted sub nom. United States Dept. of Justice v. FLRA, 39 F. 3d 361 (CADC 1994); Department of Defense, Defense Criminal Investigative Serv., 28 F. L. R. A. 1145, 1157-1159 (1987), enf’d sub nom. Defense Criminal Investigative Serv. v. FLRA, 855 F. 2d 93 (CA3 1988); see also Martin v. United States, 20 Cl. Ct. 738, 740-741 (1990).

 In fact, a violation of § 7114(a)(2)(B) seems less likely to occur when the agency and its OIG are not acting in concert. Under the Authority’s construction of the FSLMRS, when an employee within the unit makes a valid request for union representation, an OIG investigator does not commit an unfair labor practice by (1) halting the examination, or (2) offering the employee a choice between proceeding without representation and discontinuing the examination altogether. United States Dept, of Justice, Bureau of Prisons, 27 F. L. R. A. 874, 879-880 (1987); see also NLRB v. J. Weingarten, Inc., 420 U. S. 251, 258-260 (1975). Disciplining an employee for his or her choice to demand union participation or to discontinue an examination would presumably violate the statute, but such responses require more authority than Congress granted the OIG’s in the IGA.

 The same can be said of NASA’s and NASA-OIG’s concerns that the reach of § 7114(a)(2)(B) will become the subject of collective bargaining between agencies and unions, or hinder joint or independent FBI investigations of federal employees. See United States Nuclear Regulatory Comm’n v. FLRA, 25 F. 3d 229 (CA4 1994) (adopting the agency’s position that it could not bargain over certain procedures by which its OIG conducts investigatory interviews); 50 F. L. R. A., at 616, n. 13 (distinguishing FBI investigations). The process by which the scope of §7114(a)(2)(B) may properly be determined, and the application of that section to law enforcement officials with a broader charge, present distinct questions not now before us.

 The dissent does not dispute much of our analysis; it indicates that NASA-OIG is an “ar[m]” of NASA “workftng] to promote overall agency concerns.” Post, at 260. The dissent’s premise is that the Authority determined that the phrase “representative of the agency” means “representative of... agency [management],” and that this issue is now uneon-tested. See post, at 246-247, 248-259, 262. But see post, at 251, n. 3. Putting aside the fact that NASA’s and NASA-OIG’s construction of the statute — however one interprets their argument — is very much in dispute, see Brief for Respondent American Federation of Government Employees, AFL-CIO 26-32; Brief for Respondent FLRA 23-25,31, and the rule that litigants cannot bind us to an erroneous interpretation of federal legislation, see Roberts v. Galen of Va., Inc., 525 U. S. 249, 253 (1999), we have ignored neither the actual rationale of the Authority’s decision in this case nor NASA’s and NASA-OIG’s arguments before this Court. Focusing on its plain reasoning, we cannot fairly réad the Authority’s decision as turning on whether NASA “management” was involved. The Authority em-phasised that FSLMRS rights do not depend on “the organizational entity within the agency to whom the person conducting the examination reports”; and in discussing NASA-OIG’s role within the agency, the Authority’s decision repeatedly refers to NASA headquarters together with its components — that is, to the agency as a whole. 50 F. L. R. A., at 615-616; id., at 621 (noting “the investigative role that OIG’s perform for the agency” and concluding that NASA-OIG “represents” not only its own interests, “but ultimately NASA [headquarters] and its subcomponent of *246 fices”). Nowhere did the Authority rely on the assertion that OIG’s act as “agency management’s agent,” a term coined by the dissent. Post, at 253.