These consolidated cases came to be heard on the appeals of co-appellants the State Employment Relations Board ("SERB") and the City of Cleveland from the order of the trial court journalized March 16, 1998, which affirmed in part and modified in part an earlier order issued in this matter by SERB. The assignments of error and the issues presented by the two co-appellants are nearly identical and will be addressed simultaneously in this opinion.
The relevant facts in this case are not in dispute. Appellee, Cleveland Association of Rescue Employees/Communication Workers of America, Local 4550, AFL-CIO ("CARE") is the exclusive bargaining representative for a bargaining unit of emergency medical technicians and emergency medical dispatchers employed by the City's Division of Emergency Services ("EMS"). On the evening of April 11, 1996, LaVonne Sheffield Turner, the chief of staff for the mayor of Cleveland, was purported to have been involved in a car accident on the city's east side. Police Officer Debra Simmons reported that she responded to the scene where she was berated and threatened with the loss of her job by Sheffield Turner. Essentially, Sheffield Turner was accused by Simmons of demanding special treatment on the basis of her relatively high ranking position in the city's government.
Sheffield Turner denied that she had been at the scene of an accident on the night in question and denied that she had ever encountered Officer Simmons. Thereafter, the City's Division of Police's professional Conduct and Internal Review Unit ("PCIR") initiated an investigation of the alleged incident. Throughout the days and weeks following the filing of the report in question by Officer Simmons, the story remained headline news in the local print and television media. In her report, Officer Simmons alleged that EMS Unit No. 14 ("EMS-14") had transported a young, black female from the scene of the accident to a local hospital. This female was purportedly driving the other car involved in the accident, and was injured in the collision. Officer Simmons' report also provided a physical description of the two paramedics that she claimed responded to the scene.
Because the description provided by Officer Simmons of the paramedics at the scene did not match the description of the two paramedics actually assigned to EMS-14, the PCIR's investigation shifted to verifying the whereabouts of the EMS employees who were on duty on the night of the accident. Eighteen EMS paramedics were ordered to report to the PCIR's office to fill out a questionnaire and to have their pictures taken. The questionnaires were addressed to "Bruce R. Shade, Commissioner, Division of EMS" from "Lieutenant Henry A. Tekancic, Cleveland Police Department, Officer in Charge, Professional Conduct/Internal Review Unit."
CARE's president, Mark Kempe, objected to the order issued to the paramedics to respond to the PCIR office. Although Kempe was told at some point that the investigation did not center on any EMS employees, this information was never relayed to the affected EMS employees. The CARE representative at the PCIR's office, Mark Reilly, was told that he could not communicate with employees as they entered the PCIR office and that if he attempted to do so, he could be ejected from the office or arrested for obstruction of justice. CARE members stated that they did not know why they were being summoned to the PCIR offices, although many rumors were afloat.
Wayne Lach was one of the employees assigned to EMS-14 on the night of the alleged accident. Lach was initially informed by a CARE official that he had no obligation to comply with the order to report to the PCIR office unless a subpoena was first issued, although he was eventually ordered to attend the interview by his departmental supervisor. Lach was not informed, prior to attending the interview, that he was not the subject of the investigation. This same supervisor told Lach, in response to Lach's inquiry, that he need not worry about having a union representative with him at the interview. Lach was apprehensive about the interview because of the tremendous amount of publicity that had already been generated and because he feared that the administration may have been looking for a scapegoat. During the course of the interview, which took place over two days, Lach was told by the investigating police officers that his statement would be verified for accuracy by a videotape which was recorded at the accident scene. Lach was also played an audiotape wherein a speaker claimed that Lach's unit had been at the scene of the accident and that Lach and his partner had been ordered to destroy the runsheets, and not to record the run.
During the initial phase of the PCIR investigation, EMS paramedic Kevin Coleman had been on vacation and, presumably, could not be reached. After his return from vacation, Coleman and his partner, Sam Latif Ali, were ordered to present themselves at the PCIR office. Coleman and Ali were not told why they were to report to PCIR, although they were aware of the publicity surrounding the Sheffield Turner situation and had heard some rumors from other EMS employees. When Ali asked one of the investigating officers, Sergeant Calendria, whether a union representative could be present, Calendria told him that none of the other EMS employees had requested a union representative and that if he persisted in requesting a union representative, he could be brought up on charges. Coleman witnessed the exchange that took place between Calendria and Ali and did not make a similar request for a union representative.
No charges were ever filed against any EMS employees stemming from the alleged accident.
On April 24, 1996, CARE filed an unfair labor practice charge against appellant City of Cleveland alleging numerous violations of R.C. 4117.11.[1] On July 11, 1996, SERB issued a probable cause finding against the City with respect to R.C.4117.11(A)(1), (3), and (8). A hearing was held on September 16, 1996. On December 9, 1996, the hearing officer assigned to the case issued a proposed order. Subsequent to the filings of exceptions to the order, and responses thereto, oral argument was held before SERB on April 29, 1997. On June 30, 1997, SERB issued a majority order, joined by two of the three board members, finding that the city violated R.C. 4117.11 (A) (1), but not R.C.4117.11 (A) (3) or (A) (8). This order adopted the hearing officer's findings of fact. A dissenting opinion was filed by one of the three board members in which the board member expressed her belief that the City should have also been found to have violated R.C. 4117.11 (A) (3) and (A) (8).
On July 15, 1997, CARE appealed the SERB order to the Court of Common Pleas, pursuant to R.C. 4117.13 (D), alleging that the majority order was not based on substantial evidence and was contrary to law. On March 16, 1998, the trial court issued an order affirming in part, and modifying in part, the SERB order. The trial court's order found that the City committed violations of R.C. 4117.11 (A) (3) and (A) (8), as well as violations of R.C. 4117.11 (A) (1). The additional violations found by the trial court in its modification of the SERB order concerned the denial of union representation to Ali and Coleman in their PCIR interviews and the refusal by the City to permit CARE to represent its members during their interviews with the police investigators. The within appeal was timely filed from the order of the trial court on April 14, 1998.
This court will first address the issue of whether CARE members in general, and Sam Latif Ali in particular, were denied union representation despite having made valid requests to the investigators for such representation.
Co-appellant SERB's first assignment of error states:
 THE COMMON PLEAS COURT ERRED IN FINDING THAT SAM LATIF ALI WAS "SPECIFICALLY DENIED REPRESENTATION" IN VIOLATION OF R.C. 4117.11 (A) (1) SINCE SERB CORRECTLY DETERMINED THAT SAM LATIF ALI DID NOT HAVE A REASONABLE BELIEF THAT DISCIPLINE WOULD BE IMPOSED AND, THEREFORE, WAS NOT ENTITLED TO UNION REPRESENTATION.
Co-appellant City of Cleveland's first assignment of error states:
 THE TRIAL COURT ERRED IN CONCLUDING THAT VALID REQUESTS FOR REPRESENTATION BY CARE MEMBERS HAD BEEN DENIED BY THE CITY, IN CONTRADICTION OF SERB'S ORDER BELOW.
Co-appellant City of Cleveland's third assignment of error states:
 3. THE TRIAL COURT ERRED IN FINDING THAT CARE MEMBER SAM LATIF ALI MADE A VALID REQUEST FOR REPRESENTATION WHICH WAS DENIED BY THE CITY, IN CONTRADICTION OF SERB'S ORDER BELOW.
The facts surrounding the interviews of CARE members have already been recounted in this opinion. In its majority opinion SERB concluded that a R.C. 4117.11 (A) (1) violation had been committed against Wayne Lach, one of the EMS workers on the scene the night of the incident, because he requested representation, was denied representation, and he had a reasonable belief that discipline might be imposed as a result of the interview. SERB did not find that all of these elements were present in any of the other interviews.
Sam Latif Ali inquired of one of the investigators as to whether he was entitled to union representation. The investigator then communicated to Ali that his request was not appreciated and that if Ali persisted in pursuing the issue he could land in serious trouble. SERB nonetheless found that no unfair labor practice was committed because Ali did not have a reasonable belief that discipline might be imposed as a result of the interview. The trial court reversed SERB on this issue, concluding that Ali did have a reasonable belief that discipline could be imposed as a result of the interview and, therefore, an unfair labor practice had been committed.
When undertaking a review of decision of an administrative agency, a court of common pleas acts in a limited appellate capacity. University Hospitals, University of Cincinnati Collegeof Medicine v. State Emp. Relations Bd. (1992), 63 Ohio St.3d 339,343, citing Andrews v. Bd. of Liquor Control (1955),164 Ohio St.2d 275, 279-280, 131 N.E.2d 390, 393-394. In State Emp.Relations Bd. v. Miami University (1994), 71 Ohio St.3d 351, 353, the Supreme Court outlined the role of courts in reviewing appeals from a SERB order:
 In assessing SERB's policy, this court must afford deference to SERB's interpretation of R.C. 4117. * * * The General Assembly has entrusted SERB with the responsibility of administering the statute, and has bestowed upon it the special function of applying the statute's provisions to the complexities of Ohio's industrial life. * * * Our review is limited to whether SERB's policy is unreasonable or in conflict with the explicit language of R.C. Chapter 4117.
The standard of review for an appellate court reviewing an appeal of a trial court's review of an order of adjudication rendered by SERB is as follows:
 * * * the determination of whether the order of the agency can withstand the standard of review prescribed by R.C. 4117.13 (D) is essentially a question of law for the court of common pleas. As such, a reviewing court which seeks to ascertain whether the common pleas court has applied the appropriate standard of review to SERB's factual findings is not compelled to adhere to the conclusion reached by the common pleas court. Rather, it is the prerogative and the responsibility of the court entertaining the appeal to investigate whether the lower court accorded due deference to the factfinder. * * * Where the common pleas court has not properly deferred to the factual determination of the agency as required by R.C. 4117.13 (D), it is within the authority of the appellate court to reverse the lower court and to reinstate the order of the agency. Univ. Hosp., Univ. of Cincinnati College of Medicine, 63 Ohio St. 3d at 343-344.[2]
The appellants in this case are not alleging that the trial court failed to recognize the "extremely deferential standard of review" which is to be applied to factual determinations of SERB, pursuant to R.C. 4117.13 (D)." Id. at 343. The trial court and the parties accepted the facts as outlined in the SERB majority opinion. The dispute lies in the application of the facts to the determination of whether the City committed a violation of R.C.4117.11 (A) (1) when it denied union representation to CARE members who requested assistance, and in the question of whether the SERB decision was supported by the agreed upon facts in the record.
The United States Supreme Court set forth the standard to be utilized in determining the right to representation in NLRB v.Weingarten, Inc. (1975), 420 U.S. 251, 95 S.Ct. 959,43 L.Ed.2d 171.[3] In order to establish a Section4117.11 (A) (1) violation, four elements must be proven:
1) that the interview was investigatory,
 2) that the employee requested the presence of a union representative and that such request was denied,
 3) that the employee reasonably believed that the interview might result in disciplinary action, and
 4) that subsequent to the employer's denial of representation, the employer compelled the employee to continue the interview.
Id. (Emphasis added.)
In the case of Ali, the appellants concede that all of theWeingarten elements are present, except for the third. Thus, the main issue to be decided in this case is whether the CARE members who were ordered to report to the PCIR offices, including Ali and Coleman, had a reasonable belief that their interview with the PCIR officers might result in disciplinary action. The trial court addressed this issue as follows:
 Respondent (City of Cleveland) violated section 4117.11 (A) (1) by refusing to grant the employees' requests for union representation under circumstances in which they were entitled to union representation, and by then forcing those employees to continue with the investigation without union representation under the threat of discipline for insubordination. Included in the employees specifically denied representation are Wayne Lach, Sam Latif Ali, and Kevin Coleman.
After a thorough review of the record, this court is compelled to conclude that the trial court did not err when it concluded that the SERB order was not supported by the substantial evidence on the record as a whole. The record indicates that, at the time of the interview, Ali was apprehensive and objectively believed that the interview might result in disciplinary action. The investigating officers could have very easily allayed these concerns, but they chose not to, for whatever reason. The investigating officers' conduct towards Ali, as evidenced by the undisputed facts contained in the record, can be fairly labeled as aggressive and/or confrontational. This observation is not meant as criticism of the police officers conducting the interview. In many instances it becomes necessary to adopt such a strategy to further the aims of the investigations. Yet, such conduct does naturally form a basis for an employee forming a reasonable belief, as did Ali in the instant case, that disciplinary action may arise out of the interview.
In retrospect, it seems as if these interviews would not have been hampered by the presence of a union representative. It is not evident from the record why the investigators were so adamantly opposed to any consultation between CARE members and union representatives. Co-appellant City of Cleveland is maintaining that it is entitled to act in such a manner during the conducting of an investigation as to give rise to a reasonable belief on the part of a union member that he may be subject to disciplinary action, yet routinely deny such representation where the employee is not the actual target. TheWeingarten standard only requires that an employee reasonably believe that an interview might result in disciplinary action to be entitled to request union representation. We do not look back on the entirety of the investigation to assess the objective likelihood that disciplinary action might actually have arisen as a direct result of the interview.
Because of the unusual circumstances surrounding the investigation in this case, and because of the demeanor of the PCIR officers assigned to interview the CARE members, this court concludes that the substantial evidence on the record as a whole does not, as a matter of law, support the SERB's majority determination that co-appellant City of Cleveland did not commit an R.C. 4117.11 (A) (1) unfair labor practice violation during the course of the Ali interview, and during the course of the other interviews in which CARE employees made requests for union assistance which were not honored. Therefore, the trial court did not err when it modified SERB's order in this regard. Accordingly, these assignments of error are overruled.
The second issue presented in this consolidated appeal is whether CARE member Kevin Coleman made a valid request for representation prior to submitting to an interview with the PCIR investigators. Co-appellant SERB's second assignment of error states:
 THE COMMON PLEAS COURT ERRED IN FINDING THAT KEVIN COLEMAN WAS "SPECIFICALLY DENIED REPRESENTATION" IN VIOLATION OF R.C. 4117.11 (A) (1) SINCE SERB CORRECTLY DETERMINED THAT MR. COLEMAN NEVER INVOKED, EXERCISED OR ASSERTED HIS RIGHT TO UNION REPRESENTATION AND, THEREFORE WAS NOT ENTITLED TO UNION REPRESENTATION.
Co-appellant City of Cleveland's second assignment of error states:
 2. THE TRIAL COURT ERRED IN FINDING THAT CARE MEMBER KEVIN COLEMAN MADE A VALID REQUEST FOR REPRESENTATION WHICH WAS DENIED BY THE CITY, IN CONTRADICTION OF SERB'S ORDER BELOW.
The facts as they apply to these assignments of error are also not in dispute. Kevin Coleman accompanied Sam Latif Ali to the PCIR offices. The investigators assigned to the case decided to take Ali first. When Ali made his request for representation, and was subsequently refused and threatened with disciplinary and/or criminal sanctions, Coleman was in the room. Thus, Coleman asserts that although he desired union representation, he did not verbalize his request to the investigators because he realized that he would receive, at the least, the same angry response as did his partner.
The trial court found that Coleman made a valid request for representation because he was prevented from verbalizing his request only by the wrongdoings of the city investigators vis-a-vis Ali. The trial court concluded:
 Mr. Coleman did not voluntarily waive his right to representation when he chose not to place himself in the position of receiving discipline and reprisal by requesting representation after seeing his partner threatened with discipline for making the same request. An employee should not be required to place his employment or freedom in jeopardy in order to assert his right to representation when it becomes objectively clear that the right will be denied, and the consequences of making the request are grave. To hold otherwise would be contrary to the intent of the statute.
The appellants do not dispute that Coleman witnessed the exchange between Ali and the investigators; but, nevertheless, contend that Coleman was required to affirmatively request assistance in order for a finding to be made that Coleman made a valid request for union representation.
Although this court recognizes that a collective bargaining unit member must usually make an oral request for union representation before an unfair labor practice act can be found, in the instant case the holding of SERB was against the substantial evidence on the record as a whole, and was incorrect as a matter of law, because it served to ratify the unreasonable behavior of the PCIR investigators. Therefore, the trial court did not err when it modified the SERB order in this regard and found that co-appellant City of Cleveland committed an R.C.4117.11 (A) (1) unfair labor practice violation against Kevin Coleman.
In its majority opinion SERB described the confrontation between Ali and the SERB investigators witnessed by Coleman, as follows:
 When they arrived at PCIR, Mr. Ali asked for a union representative. Sergeant Calendria * * * waiving the pictures of the other EMS employees, told Mr. Ali: "The Union (sic) has nothing to do with this * * * All these people in these pictures here came down here without asking for no (sic) Union (sic) representation, why have you got to come down here and give us a problem? * * * If you want to keep complaining about the Union, (sic) then you'll be brought up on charges[.]" * * * Mr. Coleman did not request a union representative after observing the response to Mr. Ali's request for representation.
Thus, SERB's opinion recognized that the only reason Coleman did not request a union representative is that he was rightfully concerned with the potential severe adverse consequences of such a request.
Human experience tells us that if Coleman had made a request similar to the one made by Ali, the response of the investigating police officers would have been even more explosive than when Ali made the request. The investigators knew that Coleman witnessed the above documented confrontation with Ali and, most likely, considered Coleman to be on notice that no future requests for union assistance would be tolerated. To hold that Coleman was nevertheless required to verbalize his desire for union representation is illogical. The law does not require the performance of a vain act. See, e.g., Carlin v. Mambuca (1994),96 Ohio App.3d 500, 512; Morrow v. Morrow (September 4, 1998), Lake App. No. 97-L-237, unreported. In this case Coleman would not only have been undertaking a vain act if he had verbalized his request for representation, but he may have also exposed himself to punitive measures. Therefore, the trial court did not err when it found that co-appellant City of Cleveland committed a R.C. 4117.11 (A) (1) labor practice violation against Kevin Coleman and modified the SERB order accordingly. These assignments of error are overruled.
The third issue presented in this case is whether co-appellant City of Cleveland committed a R.C. 4117.11 (A) (8) violation by preventing the union officials from representing CARE members who requested assistance.
Co-appellant SERB's third assignment of error states:
 THE COMMON PLEAS COURT ERRED IN FINDING A VIOLATION OF R.C. 4117.11 (A) (1) AND (A) (8) SINCE THE UNION WAS FULLY APPRISED OF THE FACTS AND KNEW OR SHOULD HAVE KNOWN THAT THE EMPLOYEES IN QUESTION WERE NOT ENTITLED TO UNION REPRESENTATION.
Co-appellant City of Cleveland's fourth assignment of error states:
 THE TRIAL COURT ERRED IN FINDING THAT THE CITY PREVENTED CARE FROM REPRESENTING ITS MEMBERS AFTER CARE REPRESENTATIVES THREATENED TO INTERFERE WITH THE CITY' S INVESTIGATION, WITHOUT FIRST APPLYING THE BALANCING TEST ESTABLISHED BY THE U.S. SUPREME COURT IN NLRB V. WEINGARTEN, AS HAD BEEN APPLIED IN SERB'S RULING BELOW.
R.C. 4117.11 (A) (8) prevents an employer from causing or attempting to cause an employee organization, its agents or representatives to commit an unfair labor practice. The undisputed facts as they relate to these assignments of error are as follows. CARE President Mark Kempe initially objected to the order of EMS Commissioner Bruce Shade that all employees on duty on the night in question present themselves at the PCIR offices for interviews. Commissioner Shade told Kempe that no EMS employees were the "focus of the investigation." Edward Eckart, the Executive Administrator to the Safety Director, also told Kempe that no EMS employees were "under suspicion." Neither of these representations by City officials were ever related to the EMS employees prior to their interviews.
The CARE representative at PCIR, Mark Reilly, was not permitted to consult with bargaining unit members. When Reilly asked the police investigators whether employees could be held responsible for unsatisfactory answers to questions, he was not given an answer. Mr. Reilly's supervisor, Bruce Campbell, warned him that if he "advised employees not to cooperate with the investigation" he could be forcibly removed from the PCIR office and/or arrested for obstruction of justice. Campbell also warned Reilly that any CARE members who did not satisfactorily cooperate with the investigation could be written up within the department for insubordination. Reilly sat quietly outside of the PCIR offices while the initial interviews were being conducted. Two employees requested advice from Reilly, but he was made to tell them that he could not talk to them.
Initially, this court finds it relevant that Reilly was warned against "advising employees not to cooperate." Similarly, the co appellant City of Cleveland stresses in its brief that Reilly was merely prevented from "interfering" with the investigation. There is nothing in the record to support the notion that Reilly at any time indicated, by his words or deeds, a desire to impede the investigation by causing EMS employees to stonewall the investigators. If the relevant persons in charge of the investigation had merely communicated to Reilly that Officer Simmons was the focus of the investigation and that no EMS employees needed to fear disciplinary action as a result of the interview, Reilly could have passed this information on to the bargaining unit members as they arrived at the PCIR offices, and the investigators could have proceeded to ask their questions concerning individual EMS workers' whereabouts on the night of the alleged incident. Instead, the investigators and Reilly's supervisors threatened him with physical removal from the office and arrest if he interfered. Why did the persons in charge of the inquiry fear that a CARE union representative would interfere with an investigation that did not concern CARE members? Why did they take such a hard line stand against a person with no conceivable interest in torpedoing the investigation and who had merely asked if employees who did not answers the questions asked of them correctly, could be held accountable? If there are answers to these questions, they are not contained in the record before this court. This court's review is confined to those facts contained within the record.
The substantial evidence on the record, as a whole, supports the trial court's conclusion that co-appellant City of Cleveland violated R.C. 4117.11 (A) (8) when officials refused to let the CARE representative assigned to the PCIR office communicate with CARE members. As has already been established in this opinion, the CARE members who were interviewed by the PCIR officers were entitled to representation because there was an objective basis for each of them to believe that disciplinary action could result from the interview. Union representative Reilly appears to have been simply attempting to do his job, but was stymied in no uncertain terms for reasons unknown. An employer cannot prevent a union representative from communicating with bargaining unit members every time an employer feels that the representative may "interfere" with an investigation by apprising members of their rights.
Appellants' contention that because no CARE members were the target of the investigation, they were, therefore, justified in their stifling of Reilly is not persuasive for a number of reasons. First of all, this self-serving assurance was never passed on to the relevant EMS employees or to Reilly. Thus, the employees interviewed were justified in fearing sanctions and in requesting union assistance at the time of the interview. As was discussed earlier in this opinion, nothing was stopping the investigators at PCIR from relaying to the workers or to their representative the "open secret" that they had nothing to fear from the investigation. Yet, they repeatedly refused to do so. Additionally, the conduct of the investigators towards the union members who requested representation, and towards Reilly, belies the assertion that Officer Simmons was the sole focus of the investigation at the time the interview was conducted. Whatever the motivating factors, the interviews with the EMS employees at issue in this case were not, according to the undisputed facts in the record, conducted in the non-threatening manner that would have been consistent with the City's contention that no CARE member ever had any reasonable belief that disciplinary action could arise from the interview. Therefore, the members interviewed were entitled to union representation, and the City violated R.C. 4117.11 (A) (1) and (8) when it denied the members request for representation, and when it refused to permit the union representatives on the scene to communicate with their members prior to the interviews taking place. These assignments of error are overruled.
JUDGMENT: AFFIRMED.
It is ordered that appellee recover of appellants its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
McMONAGLE, TIMOTHY E., P.J., and SWEENEY, JAMES D., J.,CONCUR.
 ___________________________________ MICHAEL J. CORRIGAN JUDGE
N.B. This entry is an announcement of the court's decision. See App.R. 22 (B), 22 (D) and 26 (A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22 (E) unless a motion for reconsideration with supporting brief, per App.R. 26 (A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22 (E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).
[1] R.C. 4117.11, titled "Unfair labor practice" states in pertinent part as follows:
 (A) It is unfair labor practice for a public employer, its agents, or representatives to:
 (1) Interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Chapter 4117. of the Revised Code * * *;
* * *
 (3) Discriminate in regard to hire or tenure of employment or any term or condition of employment on the basis of the exercise of rights guaranteed by Chapter 4117. of the Revised Code. * * *
* * *
 (8) Cause or attempt to cause an employee organization, it agents, or representatives to violate division (B) of this section.
[2] The appellee cites this case for the proposition that "[a]lthough SERB's interpretation of 4117 (sic) is entitled to due deference, such deference does not mean that SERB's interpretation of the law is immune from `probing judicial review.'" Although this may be a legal truism, it is nowhere to be found in the cited decision.
[3] In In re Davenport, SERB 95-023 (December 29, 1995), SERB expressly adopted the Weingarten standard for determining when an employee has a right to union representation at investigatory interviews.